**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

| | |
|---|---|
| **RAQUEL PACHECO,** ) | |
| ) | |
| *Plaintiff,* ) | **CASE NO.: 1:26-cv-21901-CMA** |
| ) | |
| v. ) | |
| ) | |
| **CITY OF MIAMI BEACH,** ) | |
| a Florida municipal corporation; ) | |
| **STEVEN MEINER,** ) | |
| in his individual and official ) | |
| capacities as mayor of Miami Beach; ) | |
| **DAVID SUAREZ**, in his official ) | |
| capacity as Miami Beach City ) | |
| City Commissioner; ) | **Jury Trial Demanded** |
| **WAYNE A. JONES,** ) | |
| in his individual and official capacities ) | |
| as Chief of Miami Beach Police ) | |
| Department; and **ERIC CARPENTER,** ) | |
| in his official capacity as Manager ) | |
| of the City of Miami Beach; ) | |
| ) | |
| *Defendants*. ) | |
| ) | |

<u>**AMENDED COMPLAINT FOR DECLARATORY JUDGMENT,
PERMANENT INJUNCTION, AND DAMAGES**</u>

Plaintiff RACHEL PACHECO ("Plaintiff"), by and through undersigned counsel, files

this Amended Complaint against Defendants CITY OF MIAMI BEACH, STEVEN MEINER,

DAVID SUAREZ, WAYNE A. JONES and ERIC CARPENTER, prior to the filing of any

responsive pleading by any Defendant, and alleges as follows:

**INTRODUCTION**

1.      This is an action brought under the First Amendment of the U.S. Constitution, 42 U.S.C. § 1983, and 42 U.S.C. § 1988, for claims of First Amendment viewpoint discrimination, retaliation, and unlawful prior restraint.

2.      The City of Miami Beach has established a practice of taking adverse action and retaliating against individuals and groups who express support for the Palestinian people and/or criticize the State of Israel.  City officials wield the power of government to silence such opinions.

3.      This viewpoint-based discrimination takes many forms. At City Commission meetings, statements supporting Palestinians and criticizing Israel are routinely cut off and met with hostility from Defendants, while expressions of support for Israel are welcomed and allotted more time.

4.       Defendants have enacted and enforced an anti-protest ordinance that aims to restrict demonstrations expressing pro-Palestinian or anti-Israeli viewpoints that is the subject of a separate lawsuit. They passed an ordinance barring the City of Miami Beach from contracting with parties who boycott the State of Israel.  And Defendants have retaliated against local institutions, including a private Miami Beach movie theater, for screening *No Other Land*, an Academy Award–winning documentary depicting the experiences of Palestinians in the West Bank.

5.      Defendant Suarez has also suppressed Plaintiff's speech on social media by blocking her for expressing viewpoints on Palestine and Israel with which he disagrees.

6.      On January 12, 2026, Defendants escalated this campaign of viewpoint-based intimidation and discrimination by deploying law enforcement officers to the home of Plaintiff

Raquel Pacheco after she criticized the mayor's dehumanizing statements about Palestinians and the LGBTQ community on social media. Police officers knocked on her front door and when she opened it, confronted her about her post, stating that her speech was "concerning," implying that it was unlawful, and ordering her to "refrain from posting things like that."

7.     Afterward, Defendants refused to disavow this action—to the contrary, they defended it in the media and at a City Commission meeting.

8.     The government may not single out certain politically controversial viewpoints for punishment or suppression.  In fact, perspectives on controversial political issues are entitled to the highest level of First Amendment protection, so such action is presumptively unconstitutional.

9.     That is precisely what happened when the police confronted Ms. Pacheco in the sanctity of her own home, effectively telling her that her protected speech was unlawful, warning her not to post similar content in the future, and heavily insinuating she faced prosecution if she continued to engage in this activity.

10.     Defendants' documented insistence after the fact that their conduct was not improper means that there is no guarantee they will not do it again; rather, it is a strong indication that they intend to continue to engage in this type of conduct.

11.     In these circumstances, Defendants' actions would chill the future speech of a person of ordinary firmness.

12.     And, as Ms. Pacheco attests, Defendants have chilled her speech in concrete ways that she has identified below.  She fears further harassment from law enforcement and worries about the potential of retaliation through law enforcement channels, so she has, in fact, refrained from posting certain content.

13.     As a result of Defendants' unlawful actions, Plaintiff has suffered and continues to suffer distress, fear, humiliation, and reputational harm.

14.     For these reasons, she seeks declaratory and injunctive relief to end this ongoing violation of her First Amendment rights, as well as compensatory damages for the distress, fear, humiliation and reputational harm she has endured and continues to endure.

## JURISDICTION AND VENUE

15.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983, because the federal law claims arise under the Constitution and statutes of the United States.

16.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and authority to grant declaratory relief under 28 U.S.C. §§ 2201–2202.  An award of attorney's fees and costs is authorized pursuant to 42 U.S.C. § 1988.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) (2) because the policies at issue are those of the City of Miami Beach, which is located within the district and geographical area assigned to the Miami Division, and the events giving rise to the claim occurred in this judicial district.

## PARTIES

18.     Plaintiff Raquel Pacheco is a resident of Miami Beach. She is an Army National Guard veteran and currently a local activist who has organized protests against government overreach and attacks on civil liberties.

19.     Defendant City of Miami Beach is a municipality that operates under the laws of the State of Florida, located in Miami-Dade County, Florida.

4

20.     Defendant Steven Meiner is the Mayor of the City of Miami Beach. His official address is Miami Beach City Hall, 1700 Convention Center Drive, Fourth Floor, Miami Beach, Florida, 33139. He is sued in his official and individual capacities.

21.     Defendant David Suarez is a member of the Miami Beach City Commission. His official address is Miami Beach City Hall, 1700 Convention Center Drive, Fourth Floor, Miami Beach, Florida 33139.  He is sued in his official capacity.

22.     Defendant Wayne A. Jones is the Police Chief of the Miami Beach Police Department. His official address is Police Department, 1100 Washington Avenue, Miami Beach, Florida 33139.  He is sued in his official and individual capacities.

23.     Defendant Eric Carpenter is the City Manager of the City of Miami Beach. His official address is Miami Beach City Hall, 1700 Convention Center Drive, Miami Beach, Florida 33139.  He is sued in his official capacity.

## FACTUAL ALLEGATIONS

A.  DEFENDANTS' ESTABLISHED PRACTICE OF SUPPRESSING AND PUNISHING SPEECH CRITICAL OF ISRAEL AND SUPPORTIVE OF THE PALESTINIAN PEOPLE

24.     The City of Miami Beach has adopted a practice of targeting for punishment and suppression advocacy for the Palestinian people and/or criticism of the State of Israel.

25.     This pattern of official conduct occurred for approximately two years leading up to the incident at the center of this lawsuit, which cannot be viewed in a vacuum. Rather, it must be assessed in the broader context of this demonstrated pattern.

26.     Defendants' failure to correct these unconstitutional practices is the direct and proximate cause of Plaintiff's constitutional injuries.

5

27.     Because the unconstitutional conduct described herein was undertaken pursuant to the official policy, custom or practice of the City of Miami Beach, the City is responsible for Plaintiff's injuries (along with individual Defendants).  *See Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 (1978) (holding that municipalities may be sued under § 1983 for monetary, declaratory, and/or injunctive relief where the alleged unconstitutional action stems from a city policy, ordinance, regulation, decision, or custom).

i.   *The Anti-Boycott and Anti-Protest Ordinances, and Threatened Retribution Against a Cinema*

28.     On March 13, 2024, Defendants adopted an ordinance regulating protests. This ordinance has been challenged in separate litigation because Defendants Meiner and Suarez made clear that "the purpose of the Ordinance was to impair the expression of" views critical of Israel. *See* Complaint, *Jewish Voice for Peace v. City of Miami Beach*, No. 1:25-cv-24126-RAR (S.D. Fla. Sept. 10, 2025).[1]

29.     In September of 2024, the Miami Beach City Commission passed an ordinance prohibiting the city from contracting with entities that boycott the State of Israel; vendors must certify that they do not participate in such boycotts. *See* Press Release, *StandWithUs Salutes the City of Miami Beach for Anti-BDS Ordinance*, STANDWITHUS NEWSROOM (Sept. 11, 2024), https://tinyurl.com/2p79bj3d (last visited Mar. 20, 2026).

30.     On March 5, 2025, Defendant Meiner wrote a strongly worded letter to the Chief Executive Officer (CEO) of O Cinema, located in the City of Miami Beach.  In the letter, he directed the cinema to reconsider its decision to air the documentary film *No Other Land,*

---

[1]  The district court recently denied Plaintiff's motion for a preliminary injunction in *Jewish Voice for Peace* based on findings not pertinent to the instant proceeding.  *See Jewish Voice for Peace v. City of Miami Beach*, No. 25-cv-24126, 2025 U.S. Dist. LEXIS 234080, at *35-36 (S.D. Fla. Dec. 1, 2025).

characterizing it as "hateful propaganda," promoting antisemitism, and antithetical to the City's "strong policy of support for the State of Israel[.]" Steven Meiner, *Scheduled Showing of Film "No Other Land,"* (March 5, 2025), https://tinyurl.com/vdav84st (last visited Mar. 15, 2026).

31.     *No Other Land* documents the Israeli government's destruction of Masafer Yatta, a group of Palestinian villages in the West Bank. The film is directed by a Palestinian activist and an Israeli journalist, and has won several international prizes, including the Academy Award for Best Documentary Feature. Lauren Costantino, *Miami Beach mayor urges theater to cancel Oscar-winner he calls 'hateful propaganda,'* MIAMI HERALD (Mar. 11, 2025, 1:26 PM), https://tinyurl.com/y3ncz4ey (last visited Mar. 15, 2026).

32.     Disregarding Defendant Meiner's demands, the CEO of O Cinema proceeded to air the film.  *See* Lauren Costantino and Aaron Leibowitz, *Miami Beach mayor moves to end o Cinema lease after screening of Israel-Palestinian film*,  MIAMI HERALD (Mar. 18, 2025, 1:53 PM), https://tinyurl.com/bdf7w9ta (last visited Mar. 15, 2026).

33.     Shortly thereafter, or around March 13, 2025, Defendant Meiner introduced Resolution C7 AA, which sought to terminate the lease of O Cinema and discontinue grants that support the cinema as reprisal for its refusal to stop showing the film.  *See A Resolution of the Mayor and City Commission of the City of Miami Beach*, Miami Beach (Mar. 19, 2025), https://tinyurl.com/4dr6km2p (last visited Mar. 15, 2026); Marc Tracy and Emily Cochrane, *Florida Mayor Threatens Cinema Over Israeli-Palestinian Film*, THE NEW YORK TIMES (Mar. 13, 2025), https://tinyurl.com/4dz4nuzn (last visited Mar. 15, 2026); Lauren Costantino and Aaron Leibowitz, *Miami Beach mayor moves to end o Cinema lease after screening of Israel-*

*Palestinian film*, MIAMI HERALD (Mar. 18, 2025, 1:53 PM), https://tinyurl.com/bdf7w9ta (last visited Mar. 15, 2026).

34.     After facing a week of significant public backlash nationwide, Defendant Meiner withdrew this proposal. *See Florida mayor drops threat to evict cinema over No Other Land screening*, THE GUARDIAN (Mar. 19, 2025), https://tinyurl.com/y2ubct54 (last visited Mar. 15, 2026).

35.     Nevertheless, shortly thereafter, Defendants introduced yet another resolution, R7-H, in response to O Cinema's screening of the film. *A Resolution of the Mayor and City Commission of the City of Miami Beach*, Miami Beach (Mar. 20, 2025), https://tinyurl.com/yszuudra (last visited Mar. 15, 2026).

36.     Resolution R7-H "encouraged" O Cinema to "strive to showcase films that highlight a fair and balanced viewpoint" of Israel. *Id.*

*ii. The City of Miami Beach Commission Meetings*

37.     During Miami Beach City Commission meetings Citizens' Forums, individuals who express views critical of Israel or supportive of Palestinians are frequently interrupted or challenged by city officials, while comments expressing support for Israel are permitted to proceed without interruption.

38.     A September 11, 2024, Miami Beach Commission meeting provides one example of this pattern.

39.     During the meeting's public comment portion, a citizen opened her remarks by asking Defendant Meiner not to interrupt and to allow her to speak for the full time allotted. The citizen expressed opposition to a proposed resolution supporting a mission to Israel intended to bolster its economy and demonstrate Miami Beach's support for the country. *Sep.*

*11, 2024 Commission Meeting*, Official Website of the City of Miami Beach, (Sep. 11, 2024 at 25:23), https://tinyurl.com/u68kbvpb (last visited Mar. 15, 2026).

40. About 37 seconds after she began, Defendant Meiner cut her off, characterizing her comments as "hate speech" and "lies," and her microphone was simultaneously disabled. *Id.* at 26:00.

41. Although the citizen was eventually permitted to complete her statement, Defendant Meiner continued to attack her comments, and even questioned the truthfulness of her representation that she was Jewish. *Id.* at 28:21.

42. Another example of Defendant Meiner's and the Commission's approach to the issue occurred during the April 23, 2025, meeting, at which the Commission voted on a resolution to maximize investment in Israeli bonds and another aimed at attracting Israeli and Jewish-owned businesses to Miami Beach.

43. Later in the meeting, the time allotted for public comments was reduced from two minutes to sixty seconds. *Apr. 23, 2025 Commission Meeting*, Official Website of the City of Miami Beach, (Apr. 23, 2025 at 19:40), https://tinyurl.com/4x5fenc9 (last visited Mar. 15, 2026).

44. During this meeting, Defendant Meiner:

a. stated that he will continue to correct "hate speech," following a citizen's comment opposing the resolutions mentioned above. *Id.* at 29:04;

b. responded to a citizen's comment critical of the resolutions and Israel with a prolonged statement about the history of Gaza and asserting that he (Meiner) could speak as long as he wished as an elected official, and labeling the citizen's comment as "hate speech." *Id.* at 41:25;

     c.  misrepresented comments by a citizen who was forcibly removed from the meeting and unfairly suggesting that the individual supported the Nazis. *Id.* at 43:03; and

     d.  interrupted a citizen who attempted to correct Defendant Meiner's characterization of the individual ejected from the meeting and denied his request to complete his remarks. *Id.* at 46:45.

45.     By contrast, citizens expressing support for Israel were permitted to finish their remarks without interruption and were not labeled as engaging in "hate speech" or alignment with Nazism. *Id.* at 55:59.

**B.**   **THE POLICE VISIT TO PLAINTIFF'S HOME ON JANUARY 12, 2026**

46.     In 2019, Plaintiff became acquainted with Defendant Meiner when they were both running for a seat on the Miami Beach City Commission.

47.     For a time, Plaintiff and Defendant Meiner maintained a friendly relationship.

48.     In 2023, Plaintiff sent Defendant Meiner a text message informing him that she had voted for him.

49.     In November 2023, having prevailed in the mayoral election, Defendant Meiner assumed office as Mayor of Miami Beach.

50.     Upon taking office, Defendant Meiner began to divert funds towards local police and increased their presence on Miami Beach.

51.     Shortly thereafter, Plaintiff began to criticize this action on the social media platforms Facebook and Instagram.

52.     On or around January 2024, Plaintiff began to criticize Defendant Meiner's unequivocal support of Israel and retaliation against anyone who disagreed with him on Facebook and Instagram.

53.     On January 1, 2026, Defendant Meiner publicized on Facebook that he was hosting Israel's Transportation Minister Miri Regev for the purpose of collaborating on transportation, mobility, infrastructure, artificial intelligence (AI), and public safety initiatives, as well as Israel's Prime Minister Benjamin Netanyahu's inaugural visit to South Florida. The post included a picture of Defendant Meiner smiling with Prime Minister Netanyahu visible in the background.

54.     On or around January 1, 2026, Plaintiff replied to Defendant Meiner's Facebook post with the following comment: "SHAME on you! Standing with a baby killer and mass murderer and bringing this trash to our beautiful city. I am so glad all of your disgusting behavior is on record – it will haunt you for generations to come and I'm here for every second of it."

55.     On January 6, 2026, in a separate Facebook post, Defendant Meiner posted the following message: "Miami Beach is a safe haven for everyone. Our city is consistently ranked by a broad spectrum of groups as being the most tolerant in the nation. By contrast, certain places like New York City are intentionally removing protections against select groups, including promoting boycotts of Israeli/Jewish businesses. Discrimination and hate against Jewish people never ends with the Jewish people. We will always stand firm against any discrimination."

56.     On January 7, 2026, Plaintiff replied to Defendant Meiner's Facebook post stating: "The guy who consistently calls for the death of all Palestinians, tried to shut down a theater

11

for showing a movie that hurt his feelings, and REFUSES to stand up for the LGBTQ community in any way (even leaves the room when they vote on related matters) wants you to know that you're all welcome here." Plaintiff concluded her reply with the inclusion of three clown emojis.

57.     Plaintiff also criticized Defendant Meiner's January 6, 2026 Facebook post with the following comments:

a.   "'We will stand firm against any discrimination'- unless you're Palestinian, or Muslim or you think those people have a right to live. Then we will strike you down with furry! Stevie, is this you? Is that Bibi behind you? You look sooooo proud. Careful your racism is showing." (This comment included the photo Defendant Meiner had previously posted of himself with Prime Minister Netanyahu).

b.   "You're joking right? Aren't you the same guy that tried to censor a movie theater? The same guy that set up 'designated free speech zones'? You're a joke!" followed by three laughing emojis and three clown emojis.

c.   "Also to clarify, NY is not removing protections for Jews, they are simply not adhering to your bullshit definition of antisemitism and treating everyone equally- you know, the American way. You're the one over here enacting policies that make it impossible for Americans to express themselves freely against actions by a foreign state. You sir are the problem. You are the censorship king and the wannabe fascist leader and you bend the knee to war criminals like Netanyahu and pedophiles like Trump."

58. On Sunday, January 11, 2026, at 7:43 p.m., Defendant Meiner sent an email to the Miami Beach Police Chief, Defendant Jones, and the City Manager, Defendant Carpenter, among others. In the email, Defendant Meiner stated:

"Chief, As we discussed, please see the post below.



Raquel Pacheco · 5d ·
The guy who consistently calls for the death of all Palestinians, tried to shut down a theater for showing a movie that hurt his feelings, and REFUSES to stand up for the LGBTQ community in any way (even leaves the room when they vote on related matters) wants you to know that you're all welcome here. 🙃🙃🙃
Reply    👍 15

59. In the middle of the night, on January 12, 2026, at 1:46 a.m., Defendant Jones responded to the email from Defendant Meiner, including Defendant Carpenter in his reply.

60. In the reply, Defendant Jones thanked Defendant Meiner for alerting him to Plaintiff's Facebook post and continued: "while she didn't issue a direct threat, her allegations are undeniably provocative and have the potential to incite others to escalate to that level."

61. The reference to "incitement" echoes language courts use to describe a type of speech that is not protected by the First Amendment.

62. On January 12, 2026, at around 1:45 p.m., Plaintiff heard a knock at her front door.

63. She looked through the peephole and saw a police officer (referred to solely for purposes of reference as "John Doe #1" and not named as a party defendant herein) standing outside with his badge prominently displayed around his neck. Startled, Plaintiff quietly stepped away from the door to retrieve her phone.

64.     Upon returning to the door, Plaintiff stood silently for a few moments (still inside), holding her phone to her chest in an attempt to calm herself down.

65.     Before Plaintiff could do so, she heard about three more raps on the door.

66.     Still shaken, Plaintiff remained silent. When there was no response, she heard John Doe #1 announce: "Miami Beach Police."

67.     From the inside of her home, and hiding behind the closed door, Plaintiff asked how she could help.

68.     John Doe #1 answered that he was there to discuss a Facebook post. Puzzled, Plaintiff replied, "a Facebook post?" John Doe #1 responded that he wanted to confirm whether the Facebook account in question belonged to Plaintiff.

69.     Only after John Doe #1 confirmed that Plaintiff would not be arrested did she open the door, at which point she was surprised to find not one but two officers—the second (referred to solely for purposes of reference as "John Doe #2" and not named as a party defendant herein) was also wearing his badge around his neck. John Doe #2 stood in front of her, with his back holding the door open, while John Doe #1 stood on her side, to the right.

70.     As depicted in a video that Plaintiff recorded of the encounter, John Doe #1 showed her a Facebook post and asked if it belonged to her. Plaintiff responded that she would not answer questions without her attorney present.

71.     Ignoring her invoking her right to an attorney's presence, John Doe #1 stated that Plaintiff was not going to jail, but the officers needed to ensure they were speaking to the person who made the post. John Doe #2 then read Plaintiff's post aloud.

72.     John Doe #1 asked again if she had written the post, and Plaintiff refused to answer.

14

73.     John Doe #2 stated that the part of the post referencing the mayor was "concerning" and stated that "we're trying to prevent someone else getting agitated or agreeing with the statement…that can probably incite somebody to do something radical" so "we wanted to get your side of it."

74.     John Doe #2 then instructed Plaintiff to "refrain from posting things like that," an implication that Plaintiff understood to mean that she could face consequences for her speech in the future.

75.     Upon information and belief, these officers belong to Defendant Meiner's personal protection detail.

76.     Upon information and belief, given the correspondence the night before between Defendants Meiner and Jones, and the fact that these officers belonged to his personal protection detail, they were sent to Plaintiff's home at the direction and/or approval of Defendants Meiner, Jones, or Carpenter, or some combination of these individuals.

77.     A reasonable person would perceive such a police visit—initiated in response to protected political speech—as an attempt to intimidate or deter further expression.

78.     Plaintiff's video of the encounter went viral on social media and earned criticisms from the American public, including First Amendment advocacy groups such as the Foundation for Individual Rights and Expression (FIRE).[2]

79.     As a result of Defendants' Meiner's, Jones's, and Carpenter's, response to Plaintiff's Facebook post (to avoid another police visit or worse consequences), Plaintiff has

---

[2] The video itself may be viewed at multiple online locations.  *See, e.g.*, The Independent, *Police in Miami Beach, Florida, turned up at home of Raquel Pacheco to question her about a Facebook post*, FACEBOOK (Jan. 20, 2026), https://tinyurl.com/ytm7u86a (last visited Mar. 20, 2026).

refrained from engaging in protected speech on multiple occasions, including criticism of political officials, their policies, and the State of Israel.

80. For example, Plaintiff has abstained numerous times from responding to certain Miami Beach Commissioners' social media posts to point out their hypocrisy in expressing zero tolerance for anti-LGBTQ hate, while allowing anti-Palestinian rhetoric to flourish; and has remained silent regarding recent proposed Florida legislation that would label certain protestors as domestic terrorists.

81. Had the police not visited her home, she would have responded to these posts and criticized the policies in question.

82. On March 13, 2026, Plaintiff wanted to share a reel on Facebook the rape of a Palestinian prisoner and the fact that Israel had just cleared the accused of all charges. The post that Plaintiff wanted to share made a reference to a statement by an Israeli philosopher comparing the current Israeli regime to the Nazis. Plaintiff decided not to post after all, because she was frightened Defendants would become irrationally incensed, which based on this prior experience, she reasonably believed could result in her arrest.

83. In sum, fearing punishment and retaliation from Defendants, Plaintiff has involuntarily suppressed and continues to suppress her constitutionally protected speech.

84. Moreover, she has suffered and continues to suffer from reputational harm, fear, humiliation, and distress as a result of police officers showing up at her home to confront her about her constitutionally protected speech and order her not to post such content again. *See Georgia v. Randolph*, 547 U.S. 103, 115 (2006) ("we hold to the 'centuries-old principle of respect for the privacy of the home[]' and 'it is beyond dispute that the home is entitled to special protection as the center of the private lives of our people.'") (quoting *Wilson v. Layne*,

16

526 U.S. 603, 610 (1999) and *Minnesota v. Carter*, 525 U.S. 83, 99 (1998) (Kennedy, J., concurring), respectively).

## C. THE FEBRUARY 5, 2026, COMMISSION MEETING

85.     On February 5, 2026, the City of Miami Beach held its first regularly scheduled commission meeting. Plaintiff was present, and the Miami Beach police officers' visit to her home was a subject of discussion.

86.     At the beginning, Defendant Meiner reduced public comment time from the usual two minutes to a mere sixty seconds per person.

87.     During the public comment period, one speaker suggested that Plaintiff's Facebook post could incite violence and praised the Commission and the Miami Beach Police Department for sending officers to her home. *Feb. 05, 2026 Commission Meeting*, Official Website of the City of Miami Beach, (Feb. 5, 2026 at 20:40), https://tinyurl.com/mu6wnr55 (last visited Mar. 19, 2026).

88.     Another speaker, who identified himself as Israeli-American, addressed Plaintiff directly and accused her of defending Hamas. The speaker also deplored the alleged treatment of women in Gaza and asserted that this was "the community that [Plaintiff] is defending." *Id.* at 29:30.

89.     Despite Defendant Meiner's reduction of time for public comment, both of these individuals were permitted to speak uninterrupted for two minutes.

90.     Those who spoke in support of Plaintiff or Palestine, however, were only allotted sixty seconds to speak.

91.     Immediately following the public comment period, Defendants devoted approximately thirty-two minutes to discussing Plaintiff and her Facebook post.

17

92.     Defendant Suarez began by delivering a speech and presentation focused on Plaintiff in which he asserted that she "hate(s) Jews." *Id.* at 52:08.

93.     He then displayed slides depicting screenshots of Plaintiff's Facebook posts, juxtaposed with social media posts of Nick Fuentes, who is generally considered to be a White Supremacist, with the obvious implication that Plaintiff's worldview is akin to Mr. Fuentes's. This was despite the fact that Plaintiff's displayed posts criticized only the State of Israel, and did not reference Jews or Judaism—in contrast to those of Mr. Fuentes.

94.     Defendant Suarez also shared a compilation video that highlighted local attacks, as well as non-local attacks, against Jewish people.

95.     Notably, the video did not include an incident that occurred the previous year in which a Miami Beach man fired seventeen shots at a Jewish father and son in their car because the assailant mistakenly believed they were Palestinian. Theo Karantsalis, *Miami Beach Man Charged in Shooting of Israeli Tourists Thought Victims Were Palestinian*, Miami Herald (Feb. 18, 2025), https://tinyurl.com/4p88rbbz (last visited Mar. 19, 2026).

96.     Following the presentation, Defendants Suarez and Meiner questioned Defendant Jones regarding Plaintiff's Facebook post. *Feb. 05, 2026 Commission Meeting*, Official Website of the City of Miami Beach, (Feb. 5, 2026 at 59:47), https://tinyurl.com/mu6wnr55 (last visited Mar. 19, 2026).

97.     Defendant Jones strongly and unequivocally defended the decision to send Miami Beach Police officers to Plaintiff's home.

98.     City Commissioner Tanya Katzoff Bhatt also shared her support for the police officers' actions and suggested that individuals confronted by police in similar situations should quickly answer officer's questions. *Id.* at 1:17:03.

99.     Defendants Jones and Meiner echoed these defenses in the media. Defendant Jones stated that:

> given the real, ongoing national and international concerns surrounding antisemitic attacks and recent rhetoric that has led to violence against political figures, I directed two of my detectives to initiate a brief, voluntary conversation regarding certain inflammatory, potentially inciteful false remarks made by a resident to ensure there was no immediate threat to the elected official or the broader community that might emerge as a result of the post.

*See* Charlotte Hazard, *Florida police defends sending detectives to woman's house over FB post critical of mayor*, KOMO NEWS (Jan. 20, 2026), https://tinyurl.com/ktuhd7f8 (last visited Mar. 15, 2026).

100.    Defendant Meiner, while denying he had ordered the officers' visit, maintained that it was appropriate as Plaintiff's post was "literally antisemitism 101" because it claimed "that Jews are trying to commit violence, so basically what's inferred is you need to commit violence against Jews." Aaron Leibowitz, *'Antisemitism 101': Miami Beach mayor defends sending Facebook post to police*, MIAMI HERALD (Feb. 5, 2026), https://tinyurl.com/4znc5ct4 (last visited Mar. 15, 2026).

101.     Defendant Meiner was or should have been aware that Plaintiff never used the word Jews or Judaism in her post, but continued to misrepresent her words so as to depict her as anti-Semitic.

102.    On February 25, 2026—twenty days after Defendant Jones defended the police visit to Plaintiff's home—the City Commission changed its rules to allow him to remain in his position as Police Chief for an additional two years. Aaron Leibowitz, *Miami Beach police chief is due to retire. City Commission wants him to stay,* MIAMI HERALD (February 26, 2026, 5:25 PM), https://tinyurl.com/3rhyn4tv (last visited Mar. 19, 2026).

103.    And this change to the rules, for the purpose of allowing Defendant Jones to continue to serve as Miami Beach's Chief of Police, was made despite the fact that the City Commission either was or should have been aware that he had written inappropriate, sexist emails that were the subject of controversy.  *See* Aaron Leibowitz, *Inappropriate past emails from top Miami Beach cops surfaced ahead of vote on chief*, THE MIAMI HERALD (Mar. 16, 2026),  https://www.pressreader.com/usa/miami-herald/20260316/281595247045343  (last visited Mar. 19, 2026).

104.    Upon information and belief, Defendant Jones' salary was $292,910 when last publicly reported in 2024. The exception the City Commission made for Defendant Jones was thus worth approximately $600,000 to him since it permits him to collect both his salary and his retirement benefits for an additional two years.

## D.  BLOCKING FROM SOCIAL MEDIA

105.    Defendant Suarez operates and/or controls individual Facebook accounts that he holds out as an official channel for communicating with the public in his capacity as Miami Beach City Commissioner.

106.    Defendant Suarez's Facebook account is titled, "David Suarez Miami Beach City Commissioner Group 5," is designated as a "Politician" page, and is similarly fully visible to the (unblocked) public.

107.    Defendant Suarez uses his Official Account to communicate legislative activity, governmental services, constituent issues, and official events by announcing positions and actions and engaging the public about governmental affairs.

108.    For example, on January 20, 2026, Defendant Suarez posted a picture of the Byron Carlyle Theater, encouraging Miami Beach residents to join him in a Town Hall with the following message:



109.    Defendant Suarez's Official Account is configured to enable public interaction through replies, reposts, and other engagement features (the "Interactive Space").

110. On February 24, 2026, following the commission meeting, Plaintiff learned that she had been blocked from Defendant Suarez's official Facebook page.

111. Upon information and belief, given the circumstances, Defendant Suarez was motivated to block Plaintiff from his official account due to her protected speech and viewpoint, specifically Plaintiff's statements criticizing the State of Israel and supporting the Palestinian people.

## CLAIMS FOR RELIEF

### COUNT I:  VIEWPOINT DISCRIMINATION IN VIOLATION OF THE FIRST AMENDMENT
### (DEFENDANTS CITY OF MIAMI BEACH, MEINER, JONES AND CARPENTER)

112. Plaintiff realleges the facts set forth in Paragraphs 1-14, 19-20, and 22-104, and incorporates those facts into this Count by reference.

113. The First Amendment, incorporated against the states through the Fourteenth Amendment, prohibits government officials from punishing or suppressing speech because of its message, ideas, subject matter, or viewpoint. *See Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) ("'the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'") (quoting *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 65 (1983)).  *See also N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (recognizing "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open[.]"); *Searcey v. Harris*, 888 F.2d 1314, 1324 (11th Cir. 1989) ("The prohibition against viewpoint discrimination is firmly embedded in first amendment analysis.").

114. The Supreme Court has repeatedly held that viewpoint discrimination is an "egregious form of content discrimination" and "presumptively unconstitutional." *Matal v.*

*Tam*, 582 U.S. 218, 248 (2017) (quoting *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829-830 (1995)). *See Keeton v. Anderson-Wiley*, 664 F.3d 865, 872 (11th Cir. 2011) (quoting *Rosenberger* to stand for the proposition that "[d]iscrimination against speech because of its message is presumed to be unconstitutional").

115. The Supreme Court also recognizes that political speech is entitled to the highest degree of protection under the U.S. Constitution. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995) (explaining that advocating a politically controversial viewpoint is "the essence of First Amendment expression.").

116. "The First Amendment 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people[.]'" *Sullivan*, 376 U.S. at 269 ((quoting *Roth* v. *United States*, 354 U.S. 476, 484 (1957)). *See R. A. V. v. St. Paul*, 505 U.S. 377, 422 (1992) (Stevens, J., concurring in judgment) ("Our First Amendment decisions have created a rough hierarchy in the constitutional protection of speech" in which "[c]ore political speech occupies the highest, most protected position[.]").

117. Government officials violate the First Amendment when they employ threats, intimidation, or other forms of informal coercion to suppress disfavored speech. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67–68 (1963) (recognizing that individuals "do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around[.]"). *See also NRA of Am. v. Vullo*, 602 U.S. 175, 198 (2024) ("The First Amendment prohibits government officials from wielding their power selectively to punish or suppress speech[;]"); *id.* at 188 (A government official cannot "use the power of the State to punish or suppress disfavored expression.").

23

118.     Plaintiff's speech at issue here—criticizing a local government official (the mayor) and his attitude towards the Palestinian people and LGBTQ community—constituted core political speech entitled to the highest level of protection under the First Amendment.

119.     Defendants targeted Plaintiff for the expression of this viewpoint.  At least some Defendants sent two Miam Beach police detectives, to her house to interrogate her about her post, and to instruct her to "refrain from posting" such content.

120.     Police confronting a private citizen at her home, telling her that her social media post is "concerning," could incite violence, and instructing her not to post such content in the future would chill a person of ordinary firmness from engaging in protected political speech in the future.  *See Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005); *White v. Lee*, 227 F.3d 1214 (9th Cir. 2000) (explaining that government officials violate the First Amendment when their acts would chill or silence a person of ordinary firmness from future First Amendment activities and rejecting a subjective inquiry).

121.     That is especially so against the backdrop of Defendants' repeated use of their public offices to silence speech critical of Israel and supportive of Palestinians, and characterizing such speech as "hate" speech, akin to Nazism, and potentially unlawful.

122.     Furthermore, and although she need not establish as much, this viewpoint-discriminatory action had its intended chilling effect: Plaintiff has abstained from posting content that she otherwise would have, because she is afraid of being targeted for a police investigation, arrested, or otherwise punished by Defendants.

123.     Accordingly, Defendants' action at issue here violated Plaintiff's First Amendment rights.

### COUNT II:  UNLAWFUL RETALIATION IN VIOLATION OF THE FIRST AMENDMENT
### (DEFENDANTS CITY OF MIAMI BEACH, MEINER, JONES AND CARPENTER)

24

124.    Plaintiff realleges the facts set forth in Paragraphs 1-14, 19-20, and 22-104 and law set forth in Paragraphs 113-117, and incorporates those facts and law into this Count by reference.

125.    It is well-established that government actions that alone do not violate the Constitution may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right.  *Thaddeus-X v. Blatter*, 175 F.3d 378, 386 (6th Cir. 1999) (citing *Crawford-El v. Britton*, 523 U.S. 574 (1998)).

126.    The essence of such a claim is that the plaintiff engaged in constitutionally or statutorily protected conduct, the defendant took adverse action against the plaintiff, and this adverse action was taken at least in part because of the protected conduct.  *Thaddeus-X*, 175 F.3d at 386-87.  *See also Bennett*, 423 F.3d at 1250 (retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action).

127.    Here, Plaintiff engaged in constitutionally protected conduct: public airing of a viewpoint about a controversial political issue and criticism of the City's mayor. *See New York Times Co. v. United States*, 403 U.S. 713, 723-24 (1971) ("the dominant purpose of the First Amendment was to prohibit the widespread practice of governmental suppression of embarrassing information").

128.    Defendants and their agents took adverse action against her, including but not limited to sending Miami Beach police detectives to Plaintiff's residence, interrogating her about the post, insinuating that her speech could cause violence for which she could be held responsible, and ordering her to "refrain" from posting such things in the future.  *See Okwedy v. Molinari*, 333 F.3d 339 (2d Cir. 342 (2003) ("oral or written statements made by public

officials" may give rise to a First Amendment claim where they "can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request."). *See also Bennis v. Gable*, 823 F.2d 723, 731 (3d Cir. 1987) ("the constitutional violation is not in the harshness of the sanction applied, but in the imposition of any disciplinary action or the exercise of permissible free speech.").

129.    As discussed, Defendants' unconstitutional acts would chill the protected speech of a person of ordinary firmness, and they did chill Plaintiff's speech. Due to Defendants' unlawful conduct, Plaintiff has refrained from engaging in protected speech, including, but not limited to, her criticism of Israel and political figures' views on Israel and Palestine.

130.    Plaintiff has suffered and continues to suffer from fear and distress (in addition to the chilling of her speech), as a result of officers summoning her from within the sanctity of her own home to interrogate her about her constitutionally protected speech and order her not to continue to exercise her rights, enshrined in the First Amendment of the U.S. Constitution.

131.    For the abovementioned reasons, Defendants violated Plaintiff's First Amendment rights.

### COUNT III:  UNLAWFUL PRIOR RESTRAINT IN VIOLATION OF THE FIRST AMENDMENT (DEFENDANTS CITY OF MIAMI BEACH, MEINER, JONES AND CARPENTER)

132.    Plaintiff realleges the facts set forth in paragraphs 1-14, 19-20, and 22-104, and law set forth in Paragraphs 113-117, and incorporates those facts and law into this Count by reference.

133.    The U.S. Supreme Court has consistently held that prior restraints—defined as government prohibition of speech before it has occurred—are presumptively unconstitutional. *New York Times Co.*, 403 U.S. at 714 (quoting *Organization for a Better Austin v. Keefe*, 402

U.S. 415, 419 (1971)) ("any prior restraint on expression comes to this Court with a 'heavy presumption' against its constitutional validity.").

134. This principle is rooted in the idea that a free society prefers to address abuses of speech after they occur, rather than preemptively censoring expression. *See Southwestern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553, 559 (1975) ("Our distaste for censorship – reflecting the natural distaste of a free people – is deep-written in our law;" "It is always difficult to know in advance what an individual will say, and the line between legitimate and illegitimate speech is often so finely drawn that the risks of freewheeling censorship are formidable.")

135. The U.S. Supreme Court has recognized that even informal actions by government officials, including threats or warnings, may violate the First Amendment when they operate to suppress or deter protected speech. *Multimedia Holdings Corp. v. Circuit Court*, 544 U.S. 1301, 1306 (2005).

136. The threat or warning "need not be explicit" to violate the First Amendment: the Supreme Court has emphasized that such actions, particularly when undertaken by officials with authority, may dissuade individuals from exercising their First Amendment rights. *See Vullo*, 602 U.S. at 193 ("Generally speaking, the greater and more direct the government official's authority, the less likely a person will feel free to disregard a directive from the official."); *Bantam Books, Inc.*, 372 U.S. at 68 (law enforcement officers' "thinly veiled threats" operated as an unlawful prior restraint on speech).

137. Defendants and their agents unlawfully restrained Plaintiff's protected speech when they sent two Miami Beach police officers with prominently displayed badges to Plaintiff's house, where they insisted upon speaking with her even after she invoked her right to an

attorney before answering any of their questions, interrogated her about the post, insinuated that her speech could cause violence, and instructed Plaintiff to refrain from posting similar content.

138.    As discussed, these actions—particularly in the context of the hostile environment Defendants have created in the City of Miami Beach towards anyone who criticizes Israel or advocates for Palestinians—would chill a person of ordinary firmness from engaging in protected political speech, and did and continues to chill Plaintiffs' speech.

139.    For the abovementioned reasons, Defendants violated Plaintiff's First Amendment rights.

### COUNT IV:  UNLAWFUL VIEWPOINT DISCRIMINATION IN VIOLATION OF THE FIRST AMENDMENT (DEFENDANT SUAREZ)

140.    Plaintiff realleges the facts set forth in Paragraphs  1-14, 21, 24-45 and 105-111, and incorporates those facts into this Count by reference.

141.    Defendant Suarez's blocking of Plaintiff violates the First Amendment because it imposes a viewpoint-based restriction on Plaintiff's right to read and participate in a public forum, right to petition the government for redress of grievances, and right to access official statements.

142.    Courts have recognized that the interactive component of an official's social-media page generally constitutes a forum for speech and that banning a critic from that interactive space constitutes unlawful viewpoint discrimination. *See Lindke v. Freed*, 601 U.S. 187, 201-04 (2024).

143.    Defendant Suarez maintains and controls an Official Facebook Account, from which Plaintiff has been blocked, as a channel for communicating with members of the public

28

regarding official matters and uses the interactive features of that account as open spaces for public engagement.

144. By intentionally opening the Interactive Space for public discussion of governmental matters, Defendant Suarez created a designated or limited public forum, subject to the constraints of the First Amendment.

145. Plaintiff engaged in, or attempted to engage in, protected speech in the Interactive Space.

146. Defendant Suarez blocked Plaintiff from his Official Account.

147. This action excluded Plaintiff from viewing and/or participating in the Interactive Space in the manner available to unblocked users, including replying to posts, engaging in threads, and interacting with Defendant Suarez's posts and other users in that forum.

148. This block also prevents Plaintiff from learning about and thereby attending events intended for citizens' public participation, such as the Town Hall Defendant Suarez announced on the Official Account.

149. Upon information and belief, Defendant Suarez's blocking of Plaintiff was motivated by Plaintiff's viewpoint and accordingly constituted viewpoint-based discrimination.

150. Viewpoint discrimination in a forum opened for public participation violates the First Amendment.

151. Defendant Suarez's conduct has caused and continues to cause Plaintiff irreparable injury, including loss of First Amendment freedoms and exclusion from ongoing civic discourse and petitioning activity.

152. The effects of the block are ongoing and continue to exclude Plaintiff from a forum in which she is entitled to participate under the First Amendment.

153. Plaintiff has no adequate remedy at law for the continuing constitutional violation, and declaratory and injunctive relief are necessary to prevent further harm.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and grant the following relief:

A. A declaration that Defendants' City of Miami Beach, Meiner's, Jones's, and Carpenter's conduct, in showing up at Plaintiff's home to question her about her protected First Amendment speech, refusing to stop after she invoked her right to an attorney, implying that she could be punished for it, and instructing her not to post such content in the future, constituted unlawful viewpoint discrimination in violation of the First Amendment;

B. A declaration that the same conduct constituted unlawful retaliation under the First Amendment;

C. A declaration that the same conduct constituted an unlawful prior restraint under the First Amendment;

D. A declaration that Defendant Suarez's blocking of Plaintiff from his Official Account violates the First Amendment;

E. A permanent injunction restraining and enjoining Defendants City of Miami Beach, Meiner, Jones and Carpenter, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them (*see* Fed. R. Civ. P. 65(d)(2)), from sending officers to Plaintiff's home or going to her home to confront her about

constitutionally protected speech and instruct her not to engage in constitutionally protected speech in the future;

F.     A permanent injunction restraining and enjoining Defendant Suarez, and his officers, agents, servants, employees, attorneys, and all persons in active concert or participation with him (*see* Fed. R. Civ. P. 65(d)(2)), from continuing to block Plaintiff from his Official Facebook Account based on viewpoint, and ordering Defendant Suarez to unblock Plaintiff;

G.     An award of compensatory damages in an amount to be determined at trial for the distress, humiliation, and reputational damage that Plaintiff suffered as a result of Defendants' unconstitutional conduct;

H.     An award of reasonable attorneys' fees and costs to Plaintiff pursuant to 42 U.S.C. § 1988 and all other applicable legal authorities;

I.     Such other and further relief as the Court deems just and proper.


March 24, 2026

*Respectfully submitted,*


BENJAMIN, AARONSON, EDINGER &
PATANZO, P.A.


  /s/ Gary S. Edinger
GARY S. EDINGER, Esquire
Florida Bar No.: 0606812
305 N.E. 1st Street
Gainesville, Florida 32601
(352) 338-4440/ 337-0696 (Fax)
GSEdinger12@gmail.com


31

JENIN YOUNES, Esquire
National Legal Director
AMERICAN-ARAB ANTI-DISCRIMINATION
COMMITTEE
New York Bar # 5020847
910 17th Street Northwest, Suite 1000
Washington, D.C. 20006
Telephone: (202) 244-2990
jyounes@adc.org

*Attorneys for Plaintiffs*

32