**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 26-21901-CIV-ALTONAGA/Reid**

RAQUEL PACHECO,

      Plaintiff,

v.

CITY OF MIAMI BEACH;
STEVEN MEINER, individually;
DAVID SUAREZ, individually; and
WAYNE A. JONES, individually,

      Defendants.

_____/

---

**DEFENDANTS' JOINT MOTION TO DISMISS SECOND AMENDED COMPLAINT
AND INCORPORATED MEMORANDUM OF LAW**

---

Defendants City of Miami Beach, Steven Meiner, David Suarez, and Wayne A. Jones (collectively, "Defendants") respectfully move to dismiss Plaintiff Raquel Pacheco's Second Amended Complaint, ECF No. 59 ("Complaint"), and as grounds state the following.[1]

## INTRODUCTION

Plaintiff purports to assert First Amendment claims against the City of Miami Beach, its Mayor, a City Commissioner, and its Police Chief. The claims arise out of a brief visit by two Miami Beach police officers to Plaintiff's doorstep to ask her questions about a social media post in which she falsely accused the Mayor of "consistently call[ing] for the death of all Palestinians."

The allegations show that Plaintiff posted on Mayor Steven Meiner's Facebook page, among other things, the patently false claim that the Mayor is a "guy who consistently calls for the death of all Palestinians."[2] The Mayor forwarded this post to the City's Chief of Police, who noted that, while not a direct threat, the statement was "undeniably provocative" and had "potential to incite others." The next day, two Miami Beach police officers knocked on Plaintiff's door and had a short conversation with her on her doorstep. The conversation was recorded by Plaintiff and shows that she was not cited or threatened with arrest or any adverse action. The officers merely tried to confirm that she made the post and advised her that accusing the Mayor of "consistently call[ing] for the death of all Palestinians" "can probably incite someone to do something radical. That's all we're here to talk about. And we wanted to get your side." Plaintiff responded that she intended to continue to exercise her First Amendment rights and she ended the conversation.

As shown below, the Complaint fails to state a First Amendment claim for relief for several reasons. First, Counts I and II should be dismissed because a brief interaction with police, unaccompanied by the imposition or threat of adverse consequences, was not an adverse action likely to deter a person of ordinary firmness from the exercise of their rights. In a tacit admission of the weakness of her claim, Plaintiff has voluntarily amended her claims to assert the conversation was part of a broader campaign against Plaintiff that included an "attack" on her speech at two subsequent Commission meetings. But this newly pled theory fails because (1) the

---

[1] Unless otherwise indicated, all emphasis is added and internal citations are omitted.

[2] Ms. Pacheco's social media post is not only highly inflammatory and provocative, but the evidence will show it is patently false. The Mayor of the City of Miami Beach has never called for the death of all Palestinians and none of the complaints or other papers filed by Plaintiff in this case provide any support whatsoever for the outrageous claim that the Mayor consistently does so.

Commission video does not reflect harassment, but instead a robust, open forum debate, itself protected by the First Amendment and legislative immunity, and regarding the very issues Plaintiff believes are important to discuss; (2) where alleged retaliation is in the nature of speech, such speech does not adversely affect a citizen's rights absent "a threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action will imminently follow," which Plaintiff has not and cannot establish here; and (3) the "campaign" is in reality just the police visit and subsequent discussion and debate at Commission meetings, which falls far short of the type of ongoing harassment found to violate the First Amendment.

Second, Count III should be dismissed because there has been no prohibition on Plaintiff's speech and a vague and incomplete statement, without any threat of sanctions, is not the type of informal coercion which has been found to be a prior restraint.

Third, Plaintiff has failed to show she suffered a deprivation of rights pursuant to a policy or custom to establish a claim against the City on Counts I-III. The handful of legislative and political activities alleged do not constitute a widespread and persistent pattern of unconstitutional misconduct. Count IV also fails against the City because the claim seeks relief from Commissioner Suarez, not the office that he holds, and there is no allegation that Plaintiff was blocked from the Facebook account pursuant to an official policy or custom of the City.

Fourth, Count IV fails to establish Commissioner Suarez was a state actor as to allegedly blocking Plaintiff from his personal Facebook page as it has not been shown he had actual authority to speak on behalf of the City on social media or that his page was used to fulfill his responsibilities.

Finally, Chief Jones, Mayor Meiner, and Commissioner Suarez are entitled to qualified immunity to the extent claims are asserted against them in their individual capacities because a police inquiry does not violate a clearly established right and Plaintiff's assertion of harassment does not dictate otherwise. Suarez is also entitled to qualified immunity for allegedly blocking Plaintiff from his personal Facebook page, as it is not clearly established that an elected official cannot do so when he lacks actual authority to speak on social media on behalf of the City.

**<u>RELEVANT FACTUAL ALLEGATIONS</u>**

**A.      Plaintiff Has Publicly Criticized Mayor Meiner For Over Two Years**

Raquel Pacheco is a resident of Miami Beach who began publicly criticizing Mayor Steven Meiner's actions on social media platforms shortly after he assumed office. Compl. ¶¶ 20, 50-52. In January 2024, she began criticizing Meiner's purported "unequivocal support of Israel and

retaliation against anyone who disagreed with him" on social media. *Id.* ¶ 53.

In January 2026, a full two years after she first began her public criticism of Mayor Meiner's personal views regarding Israel, Ms. Pacheco left a series of comments on two of Meiner's Facebook posts. *Id.* ¶¶ 54-58. On January 1, 2026, Meiner posted that he was hosting Israel's transportation minister for the purpose of collaborating on several public initiatives, as well as Israel's Prime Minister's visit to South Florida. *Id.* ¶ 54. Ms. Pacheco commented on the post that Meiner was "[s]tanding with a baby killer and mass murderer and bringing this trash to our beautiful city. I am so glad all your disgusting behavior is on record – it will haunt you for generations to come and I'm here for every second of it." *Id.* ¶ 55.

On January 6, 2026, Mayor Meiner posted: "Miami Beach is a safe haven for everyone. Our city is consistently ranked by a broad spectrum of groups as being the most tolerant in the nation. By contrast, certain places like New York City are intentionally removing protections against select groups, including promoting boycotts of Israeli/Jewish businesses. Discrimination and hate against Jewish people never ends with the Jewish people. We will always stand firm against any discrimination." *Id.* ¶ 56. The next day, Ms. Pacheco replied to this post:

> The guy who consistently calls for the death of all Palestinians, tried to shut down a theater for showing a movie that hurt his feelings, and REFUSES to stand up for the LGBTQ community in any way (even leaves the room when they vote on related matters) wants you to know that you're all welcome here. [Clown faces]

*Id.* ¶ 57. She left three more comments criticizing the Mayor's January 6th post. *Id.* ¶ 58.

**B.      Police Spoke With Plaintiff About A Post That Raised Public Safety Concerns**

On the evening of January 11, 2026, Mayor Meiner emailed a copy of Plaintiff's Facebook post accusing the Mayor of "call[ing] for the death of all Palestinians" to Miami Beach Police Chief Wayne Jones and the City Manager. Chief Jones responded, thanking the Mayor for alerting him to the post and stating that "while she didn't issue a direct threat, her allegations are undeniably provocative and have the potential to incite others to escalate to that level." Compl. ¶¶ 59, 62-63.

Plaintiff alleges that, the following afternoon, on January 12, 2026, two officers knocked on her front door, announcing themselves as Miami Beach Police. *Id.* ¶¶ 68, 72. She alleges that one officer stated he was there to discuss a Facebook post and she would not be arrested if she opened the door. *Id.* ¶¶ 74-75. She further alleges that an officer showed her a post and asked if it belonged to her. She said she would not answer questions without her attorney present, and the officer responded that she was not going to jail, but they needed to ensure they were speaking to

the person who made the post and read it aloud.  *Id.* ¶¶ 76-77.  Plaintiff alleges that the officer "stated that the part of the post referencing the mayor was 'concerning' and said that 'we're trying to prevent someone else getting agitated or agreeing with the statement … that can probably incite somebody to do something radical' so 'we wanted to get your side of it.'"  *Id.* ¶ 79.

Plaintiff's own video recording of the interaction provides context to these allegations.  *Id.* ¶¶ 76, 83 & n.2.[3]  The video depicts that the officers calmly showed her the Facebook post and questioned if it was her account.  Pacheco Video at 0:04-0:07.  When she refused to answer the question and stated that she did not know how to answer it, one officer responded, "like I said, you're not going to jail."  *Id.* at 0:08-0:15.  The video shows that Ms. Pacheco then stated "this is freedom of speech, this is America," to which the officer responded "I agree with you 100%" and that "we're just trying to see if it's you, because if we're not talking to the right person we wanna go see who the right person is."  *Id.* at 0:15-0:24.  Ms. Pacheco then asked, "Okay, how can I help you?"  One of the officers read the post and the other asked if that was her.  *Id.* at 0:24-0:54.  An officer stated that the "concerning part, and not concerning for the person who's posting it, well, we are just trying to prevent if someone else getting agitated or agreeing with the statement.  We're not saying it's true or not."  Ms. Pacheco responded, "Understood."  *Id.* at 0:56-1:11.  The video shows that the officer again read the portion of the post about "call[ing] for the death of all Palestinians" and stated "that can probably incite somebody to do something radical.  That's all we're here to talk about.  And we wanted to get your side."  *Id.* at 1:11-1:22.

Ms. Pacheco alleges that the officers "show[ed] up at her home to confront her about her constitutionally protected speech and order[ed] her not to post such content again."  Compl. ¶ 89.

---

[3] The Court can consider Plaintiff's video footage on this motion, and where it contradicts her allegations, "must accept the video's depiction instead of the complaint's account … and view the facts in the light depicted by the video."  *Connelly v. Hall*, 2025 WL 1124528, at *2 (S.D. Fla. Apr. 16, 2025).  A court "may consider a document attached to a motion to dismiss without converting the motion into one for summary judgment" if it is "(1) central to the plaintiff's claim and (2) undisputed," *i.e.*, "the authenticity of the document is not challenged."  *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005).  Courts routinely apply this doctrine to video recordings, including bystander video.  *Baker v. City of Madison, Alabama*, 67 F.4th 1268, 1276–77 (11th Cir. 2023); *Johnson v. City of Atlanta*, 107 F.4th 1292, 1300–01 (11th Cir. 2024); *Connelly*, 2025 WL 1124528, at *1–2 & n.1.  Here, the video is central to the claims and its authenticity is not disputed, as Plaintiff recorded the video, links to it in the Complaint, and has agreed the Court may consider it on a motion to dismiss.  ECF No. 42 at n.4; Compl. ¶¶ 70, 83 & n.2 (citing The Independent, *Police in Miami Beach, Florida, turned up at home of Raquel Pacheco to question her about a Facebook post*, Facebook (Jan. 20, 2026), https://tinyurl.com/ytm7u86a ("Pacheco Video")).

But the video refutes this allegation, showing that the officer stated: "If it was you that posted that, I would think to refrain from posting things like that 'cause that could get something –" but Ms. Pacheco cut off the officer, stating "I appreciate your concern. I appreciate you coming out here." Pacheco Video at 1:22-1:31. The video shows the other officer asked "That's it?," to which Ms. Pacheco responded "That is it. I'm gonna maintain my amendment rights to not answer the question about whether or not that's me. I hope that's understandable." *Id.* at 1:32-1:40. The officers then stated "Okay," thanked Ms. Pacheco for her time, and wished her a good day before leaving. *Id.* at 1:40-1:46. The video recording of the interaction is 1 minute and 46 seconds. *Id.*

### C. Plaintiff Attended And Spoke At Two Subsequent Commission Meetings

#### 1. February 5, 2026 Commission Meeting

Although Plaintiff alleges that she "fear[ed] punishment and retaliation from Defendants" and "has involuntarily suppressed and continues to suppress her constitutionally protected speech," she attended the next regularly scheduled City Commission meeting on February 5th and spoke during the public comment period regarding the police interaction. Compl. ¶¶ 88, 90; Feb. 5, 2026 Commission Meeting, Official Website of the City of Miami Beach (Feb. 5, 2026), https://tinyurl.com/mu6wnr55 ("Feb. 5 Video"), at 8:30-10:22.[4] The meeting recording exemplifies the heated, political nature of discourse surrounding the Israel-Hamas war. A number of individuals spoke during the public comment period in support of both sides of the issue, and on unrelated matters. *Id.* at 6:06-52:00. Plaintiff alleges those who spoke in support of her and/or Palestine "were only allotted sixty seconds to speak," whereas those supporting Israel and/or the City's alleged actions "were permitted to speak uninterrupted for two minutes." Compl. ¶¶ 92-103. But video reflects all speakers were allotted sixty seconds for public comment and attempts were made to wind down each speaker after time had run, regardless of their point of view. Feb. 5 Video at 6:38-52:00; *id.* at 6:06-6:15 (City Clerk stating that "[g]iven the number of individuals that are in line, we're going to start with one minute"). Ms. Pacheco herself was permitted to speak beyond the allotted sixty seconds, speaking for nearly two minutes. *Id.* at 8:30-10:22. One speaker who argued that Plaintiff's posts could lead to violence was initially cut off at the sixty second mark and officers attempted to escort him away from the microphone. *Id.* at 20:41-23:18.

---

[4] The Court may consider the video of the February meeting, which is central to the claims and undisputed. *See* Compl. ¶ 92 (providing link to video); *id.* ¶¶ 92-103. To the extent it contradicts the allegations, the facts must be viewed in the light depicted by the video. *Supra* n.3.

Following the public comment period, the Commission engaged in discussion and debate regarding free speech and concerns that certain language and rhetoric can invite discrimination and lead to violence. *Id.* at 52:06-1:24:38; Compl. ¶¶ 96-103. Commissioners and the Mayor also questioned Chief Jones regarding Ms. Pacheco's Facebook post. Feb. 5 Video at 59:28-1:07:35; Compl. ¶¶ 101-102. Chief Jones agreed that it is "part of our charge" to evaluate the public safety risk when "rhetoric escalates into inflammatory accusations that could incite unrest" and that the "investigators that responded to Ms. Pacheco's home … [t]his is what they do. Risk assessment all the time." Feb. 5 Video at 59:46-1:00:52. Chief Jones explained his concern with one line in the post saying the Mayor had called for the death of all Palestinians and he was concerned someone would use that to cause violence to the Mayor or his family. *Id.* at 1:06:42-1:07:33. He explained that he has had ongoing concerns about the Mayor's safety given his public stance on Israel and there have been other instances not publicized where people have sent notes to the Mayor's home, which police have investigated. *Id.* at 1:05:41-1:06:26. Chief Jones referred to the officers' discussion with Plaintiff as a "knock and talk," which he noted is done "thousands of times in this country on a daily basis," including by Capitol Police responding to "concerns against members of Congress and their family." *Id.* at 1:00:53-1:02:15. Such a conversion would allow officers to ask Ms. Pacheco, as the person who posted the information, if anyone had reacted to her personally or directly or indicated they wanted to cause harm to the Mayor or his family. *Id.* at 1:02:46-1:03:14. Commissioners questioned Chief Jones whether the Mayor asked or directed anyone to send officers to Ms. Pacheco's home, to which he responded that Mayor Meiner did not and did not even know about it. *Id.* at 1:04:06-1:04:59, 1:06:30-1:06:41.[5]

### 2. May 20, 2026 Commission Meeting

Ms. Pacheco again attended and spoke at a Commission meeting on May 20, 2026. Compl. ¶¶ 110-112; *see also* May 20, 2026 Commission Meeting, Official Website of the City of Miami Beach (May 20, 2026), https://miamibeachfl.new.swagit.com/videos/388615 ("May 20 Video).[6] She spoke during public comment, criticizing Commissioner Suarez, accusing him of attacking

---

[5] The Complaint alleges that on February 24, 2026, Plaintiff learned that she had been blocked from Commissioner Suarez's Facebook page due to her viewpoint. Compl. ¶ 160 & 163.

[6] Plaintiff does not provide a link to the May 20th Video. But the Court may consider the video of that meeting in deciding this Motion, as it is referenced in the Complaint, central to the claims, and its authenticity cannot be disputed. *See supra* n.3 & 4.

the speech of residents who disagree on issues regarding Palestine, stating that he has no place in public office and brings shame and embarrassment to the City, calling on him to step down from office, and accusing Commissioners of "spew[ing] hate." May 20 Video at 35:16-36:37.

Commissioner Suarez responded directly to Plaintiff's comments, pointing out what he believed to be the hypocrisy of her invocation of free speech while criticizing others' viewpoints and comparing her statements to those made by a known antisemite. *Id.* at 36:41-37:38. Plaintiff can be heard yelling in the background, interrupting the Commissioner, calling him a liar, and shouting that he was mislabeling her. *Id.* at 37:38-38:06. She alleges that she was ushered out of the meeting room, which is not shown on the video. Compl. ¶ 112. Suarez continued to explain why he considers such discourse about Israel to be antisemitic. *Id.* at 38:03-41:39. The Mayor added his opinions regarding Israel's right to defend itself and explained that he considered Ms. Pacheco's statements to be antisemitic. *Id.* at 41:40-42:42. Several other constituents, and other Commissioners, expressed their opinions on both sides of this debate. *Id.* at 42:44-1:30:53.

### D.    Prior Political And/Or Legislative Activity Did Not Involve Plaintiff And Is Unrelated To The Police Interaction With Plaintiff

The Complaint cites to a handful of political and legislative activities that are unrelated to Ms. Pacheco and the alleged events underlying the claims in this case. For example, it cites to a number of City ordinances, including a City ordinance (City Code § 70-46) that prohibits the intentional blocking of public rights-of-way[7]; a City ordinance (City Code § 2-375.1) prohibiting the City from contracting with parties engaged in boycotts against Israel; and Mayor Meiner's public opposition to a documentary film which he considered to be antisemitic. Compl. ¶¶ 28-29, 33-34. None of these activities are alleged to have involved Plaintiff in any way or to have been directed towards her. And with the exception of the sidewalk ordinance, none of these actions have been challenged in court, and none of these activities (including the sidewalk ordinance) have been found to be unlawful or unconstitutional.

### E.    Plaintiff's Lawsuit

Plaintiff filed this action asserting claims alleging viewpoint discrimination (Count I), First

---

[7] As Plaintiff correctly notes, that ordinance is the subject of another lawsuit, *Jewish Voice for Peace, South Florida v. City of Miami Beach, et al.*, Case No. 25-cv-24126-RUIZ. That case was recently dismissed with leave to amend. *Id.*, ECF No. 80. The Court also denied the plaintiff's motion for preliminary injunction, concluding that the City had placed reasonable time, place, and manner restrictions on the plaintiff's protest activity during Art Basel. *Id.*, ECF No. 69.

Amendment retaliation (Count II), and prior restraint (Count III) based on the police conversation at her doorstep. *See* ECF No. 8 ¶¶ 119, 120, 128, 130, 137. She also asserted a claim against Commissioner Suarez in his official capacity for allegedly blocking her from his Facebook page (Count IV). *Id.* ¶¶ 140-153. Defendants moved to dismiss, pointing out, among other things, that a single incident of police officers briefly speaking with an individual about her social media post does not rise to the level of an adverse action. ECF No. 39. Apparently recognizing this, on the day Defendants' reply brief was due, Plaintiff indicated her intention to file a third version of her complaint. ECF No. 56, 57. Plaintiff dropped her official capacity claims against the individual Defendants and her claims against the City Manager; named Commissioner Suarez individually in Counts I, II, and IV; and now asserts a theory that the police conversation was purportedly part of a "campaign against Plaintiff's political speech" that continued with an "orchestrated attack on her beliefs and character" at the February and May Commission meetings. Compl. ¶¶ 123, 133. This newly asserted theory and additional allegations do not change the underlying facts in this case, which show that Plaintiff has failed to establish actionable adverse action against her.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To meet this "plausibility standard," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A complaint must plead sufficient facts to plausibly allege the required elements. *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295–96 (11th Cir. 2007). Thus, Plaintiff bears the burden of demonstrating that the facts alleged plausibly state a claim upon which relief can be granted.

## ARGUMENT

I.     **COUNTS I AND II FAIL BECAUSE THERE WAS NO INFRINGEMENT ON THE EXERCISE OF FIRST AMENDMENT RIGHTS**

Counts I and II allege that the City and Mayor Meiner, Commissioner Suarez, and Chief Jones violated the First Amendment based on the officers' inquiry about Plaintiff's social media post and discussing it at two public meetings. Count I asserts that Defendants engaged in viewpoint discrimination by targeting Plaintiff for her criticism of "a local government official (the mayor) and his attitude towards the Palestinian people and LGBTQ community." Compl. ¶¶ 120-21. Count II asserts that Defendants retaliated against Plaintiff for her "public airing of a

viewpoint about a controversial political issue and criticism of the City's mayor." *Id.* ¶¶ 131-33.

"A restriction on speech constitutes viewpoint discrimination when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Jackson v. McCurry*, 762 F. App'x 919, 930 (11th Cir. 2019). A plaintiff claiming retaliation must show her "speech or act was constitutionally protected"; "retaliatory conduct adversely affected the protected speech"; and "there is a causal connection between the retaliatory actions and the adverse effect on speech." *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005), *abrogated on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009). Both claims fail on the threshold point that there was no infringement on First Amendment rights that would chill the exercise of such rights.

### A. The Knock And Talk Did Not Infringe Upon Any First Amendment Rights

#### 1. Mere Police Questioning Does Not Amount To An Adverse Action

A plaintiff suffers an adverse action if the defendant's alleged conduct "would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Bennett*, 423 F.3d at 1250. Conduct "that tends to chill the exercise of a constitutional right might not itself deprive a citizen of such a right"; to recover, a plaintiff must show that the alleged retaliatory conduct "resulted in something more than a 'de minimus inconvenience' to the exercise" of those rights. *Bethel v. Town of Loxley*, 221 F. App'x 812, 813 (11th Cir. 2006).

While Plaintiff has attempted to augment her allegations, her claims still center on the police discussion at her doorstep. Courts have found that conduct involving a police officer merely speaking to or investigating an individual, or expressing distaste for that person's speech, without an actual or implied threat of an adverse action or consequence, is not likely to deter a person of ordinary firmness from the exercise of First Amendment rights. For example, in *Bethel v. Town of Loxley*, the plaintiffs alleged that, on four separate instances, a police chief and officer arrived where plaintiffs were handing out literature and/or holding signs with religious messages and ordered them to leave. 2006 WL 8437719, at *3–4 (S.D. Ala. Mar. 23, 2006), *aff'd,* 221 F. App'x at 813–14. The court concluded that "[s]imply being told to leave without any threat of consequences or imposition of consequences for failing to obey would not likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Id.* at *8.

Similarly, in *Kilpatrick v. United States*, the court held that an ATF officer's traffic stop of a van with critical comments about the ATF written on its windows was not retaliatory. 2009 WL 5215585, at *5–7 (N.D. Fla. Dec. 29, 2009). The officer carried out his duties in a calm and

-9-

professional manner and the fact that the officer allowed the plaintiff to speak with a television journalist who arrived during their discussion tended to show the officer "was not exactly intrusive or antagonizing." *Id.* at *6. The court further found that, "given the tenor of the discussion," the officer's comments observing that the statements on plaintiff's van might upset other ATF agents and advising her to wash the writing off her windows were de minimus and insufficient basis to deter an ordinary person. *Id.*; *see also Jeffords v. Columbia Cnty. Bd. of Cnty. Cmm'rs*, 2014 WL 6065711, at *3, 5 (M.D. Fla. Nov. 12, 2014) (commissioner's threat to file a police report did not rise to level of retaliation because plaintiff "had no reason to fear such a report so long as she continued to operate within the bounds of the law in taking pictures"); *Abella v. Town of Miami Lakes*, 2024 WL 729007, at *2 (11th Cir. Feb. 22, 2024) (affirming dismissal of retaliation claim where there were no allegations supporting claim that town manager intended to have plaintiff arrested at opponent's campaign location); *Rehberg v. Paulk*, 611 F.3d 828, 850 (11th Cir. 2010) (affirming dismissal of "retaliatory investigation" claim and agreeing that officers' "retaliatory animus does not create a distinct constitutional tort").

### 2. The Brief Interaction Here Was Unlikely To Deter A Person Of Ordinary Firmness From Exercising Their Rights

These cases demonstrate that officers merely asking questions about a social media post, without some threatened or imposed consequence – be it an arrest, citation, discipline, further investigation, violence, etc. – is unlikely to deter a person of ordinary firmness from exercising their rights. Here, after she had posted public criticism of the Mayor for years without incident, officers knocked on Ms. Pacheco's door to talk with her about a specific statement made in one social media post, explaining that part of the post could incite someone to do something radical. Plaintiff does not deny it is highly inflammatory to claim on social media that the Miami Beach Mayor "calls for the death of all Palestinians."[8] Chief Jones expressed his concern that such allegations "have the potential to incite others to escalate," not disagreement with the subject matter. It is a reasonable concern that the protected speech of residents could result in harm to elected officials, and police are within their authority to look into the issue of whether the post had provoked any public safety risks for the Mayor, his family, or other Jewish residents of Miami

---

[8] It is no answer to say that the Mayor could have deleted Plaintiff's post "at any time." Compl. ¶ 61. The statement had been publicized and the potential risk was already present.

Beach, particularly given the current environment and the Mayor's profile in the community.[9]

Like the traffic stop in *Kilpatrick*, the officers carried out their duties in a calm and professional manner, took no issue with her filming the interaction, and agreed with her statement when she asserted her right to freedom of speech. 2009 WL 5215585, at *6. The entire interaction was brief – Plaintiff's video is less than two minutes – and the officers left after she reiterated that did not want to answer any more questions.

Plaintiff alleges that she was "order[ed]" and "instruct[ed] not to post such content in the future," and that, as a result, she "is afraid of being targeted for a police investigation, arrested, or otherwise punished by Defendants." Compl. ¶¶ 121, 125, 132. But the officers never told Plaintiff she was under arrest or faced any consequences, nor did they threaten any action against her if she continued posting content in the future. *Bethel*, *Jeffords*, *Kilpatrick*, *supra*. In fact, they expressly stated twice during the short interaction that she would not be arrested. The allegation that she was ordered to refrain from posting is also contradicted by her own video. *See Baker*, 67 F.4th at 1277–78 (court should accept video's depiction of facts that contradicts allegations). The video shows that, after explaining the possibility of leading to violence, the officer merely stated "I would think to refrain from posting things like that" and started to explain, but Ms. Pacheco cut him off and the interaction ended and officers left shortly thereafter. Courts have found far more direct statements do not rise to the level of infringement. *See, e.g.*, *Kilpatrick*, 2009 WL 5215585, at *6 (advising plaintiff to wash political statements off her van windows had de minimus effect).[10]

Moreover, while a plaintiff's actual response to the defendant's conduct is not dispositive of the question of deterrence, Ms. Pacheco's assertion (¶ 134) that she has refrained from engaging in criticism of political figures is undermined by the fact that she spoke critically about officials and the police interaction at a Commission meeting shortly after and again three months after that.

---

[9] As explained by Chief Jones, "knock and talks" are commonly used, including to investigate potential danger to government officials. The "knock and talk has become a common investigatory tool utilized by law enforcement," in which "an officer may approach a house and knock on the door to, for example, question the resident about possible criminal activity there or elsewhere," and the "resident is free not to open the door" and can refuse to engage or "answer any questions at any time." *Taylor v. Nocco*, 2024 WL 3678322, at *19 (M.D. Fla. Mar. 24, 2024).

[10] Plaintiff claims she "understood [this] to mean that she could face consequences for her speech in the future" and refrained from speech because she believed it "could result in her arrest." Compl. ¶¶ 80, 87. But case law establishes that an officer's conversation without a direct or implied threat objectively would not cause a person of ordinary firmness to believe they would be arrested.

-11-

The interaction described in the Complaint and depicted in the video falls far short of conduct found to constitute an adverse action that had a chilling effect on speech. For example, Plaintiff cites (¶ 122) *White v. Lee*, 227 F.3d 1214, 1229 (9th Cir. 2000), in which HUD officials carried out investigation into plaintiffs that lasted more than 8 months, directed plaintiffs to produce publications and interrogated them under threat of subpoena, and drafted letter accusing them of violating the Fair Housing Act and advocating illegal acts. Plaintiff's claims here are nothing like the prolonged and intrusive investigation in *White*. She also cites (¶ 132) to *Bennis v. Gable*, 823 F.2d 723, 731 (3d Cir. 1987), for the proposition that it is not "the harshness of the sanction applied," but the "imposition of any disciplinary action" that is important to this inquiry. But unlike here, that case did involve a disciplinary action – demotion of government employees. *Id.* Plaintiff likewise cites *Okwedy v. Molinari*, 333 F.3d 339, 342 (2d Cir. 2003), which addressed a letter sent by a government official making an overt threat of financial impact on a billboard company if it did not remove its client's controversial billboard. No such threat was made here.[11]

In short, the law is clear that, absent some concrete action or threat beyond officers briefly asking Plaintiff some questions about a social media post that could pose a public safety threat, she cannot establish that there has been an infringement on any First Amendment right.

### B.      Plaintiff Has Not Alleged A Campaign Of Harassment Against Her

In a tacit admission that the brief police interaction does not constitute an adverse action, Plaintiff attempts to augment these counts by alleging the conversation was part of a "campaign" against her that "continued with the orchestrated attack on her beliefs and character" at the February and May Commission meetings. Compl. ¶¶ 123, 133. This fails for several reasons.

***First***, Plaintiff's characterization that she was attacked or harassed is contradicted by video of the meetings, which controls here. *See Connelly*, 2025 WL 1124528, at *2. Video reflects that the February meeting was an open forum itself protected by the First Amendment and regarding the very issues that Plaintiff believes are important to air. Different points of view were given,

---

[11] Plaintiff also cites (¶ 119) two cases that involved direct threats and restrictions that are not at issue here. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67–68 (1963) (state morality commission, which investigated and recommended prosecution of book publishers for violation of obscenity laws and effectively eliminated safeguards of criminal process, operated as coercive prior restraint); *NRA of Am. v. Vullo*, 602 U.S. 175, 198 (2024) (superintendent of state department of financial services coerced regulated entities by threatening enforcement actions against those entities that refused to dissociate with the NRA and other gun-rights groups).

including on the Israel-Hamas conflict, the officer visit, and the language in the post and whether it crossed the line to incitement. All individuals who wished to express their views on the issue were given equal opportunity to speak. And video of the May meeting shows that Commissioner Suarez responded directly to Plaintiff's comments accusing commissioners of spewing hate, claiming he is an embarrassment to the City, and calling on him to step down. *Supra* 5-7.

**Second**, any alleged retaliation based on the speech of elected officials is not actionable here. "The role that elected officials play in our society makes it all the more imperative that they be allowed freely to express themselves on matters of current public importance." *Wood v. Georgia*, 370 U.S. 375, 395 (1962). Indeed, the "First Amendment protects a public official's statements in response to his detractors just as much as it protects the detractor's statements." *Frank v. Fine*, 2024 WL, 473718 at *6 (M.D. Fla. Jan. 5, 2024). Where, as here, "a public official's alleged retaliation is in the nature of speech, in the absence of a threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action will imminently follow, such speech does not adversely affect a citizen's First Amendment rights[.]" *Shiver v. City of Homestead, Fla.*, 2021 WL 5174526, at *14 (S.D. Fla. Oct. 4, 2021).

There were no threats that any action against Plaintiff would follow. Instead, Commission meeting recordings confirm that comments by elected officials, which were made in an open forum, responded to constituent remarks and criticism, sought to contextualize the concerns raised by Plaintiff's statement and discuss the actions taken, and/or expressed the speaker's viewpoint on such rhetoric and how the City should address citizen concerns on the issue. *See Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 688 (4th Cir. 2000) (imposing liability on an official "who responds in kind to protected speech critical of the official" would be inconsistent with the First Amendment) (citing *Thoma v. Hickel*, 947 P.2d 816, 821 (Alaska 1997) ("Debate is impossible where only one side can speak. Making public officials civilly liable for retaliatory speech would, in essence, convert the First Amendment model of an interchange into a one-way street.")).

The crux of Plaintiff's allegations is her disagreement with the opinions expressed by public officials, including whether statements critical of Israel can amount to antisemitism. Compl. ¶¶ 97-99, 105-106, 124. But the duplicity of suggesting that Ms. Pacheco's viewpoint is protected speech whereas Defendants' is harassment should not be lost. Plaintiff alleges at most that she was publicly embarrassed, which falls far short of pleading that comments by elected officials constituted an imminent threat of punishment, sanction, or regulatory action. *See Shiver*,

2021 WL 5174526, at *14 (plaintiff failed to state retaliation claim where at most he alleged that official's speech publicly damaged his reputation, which did not amount to threat of adverse action); *Frank*, 2024 WL 473718, at *6 (official's statements referring to plaintiff as a Nazi were not adverse action as they did not "constitute an imminent threat" and were "not so untoward so as to deter a person of ordinary firmness"); *Jeffords*, 2014 WL 6065711, at *3–5 (commissioner's statements at meeting expressing distaste for plaintiff's speech not actionable where he did not issue a threat or list any potential consequence resulting from his anger at plaintiff).

In addition to being protected speech, this debate regarding inflammatory discourse and public safety on the Commission floor during a public meeting is protected by legislative immunity. *See DeSisto Coll., Inc. v. Line*, 888 F.2d 755, 765 (11th Cir. 1989) (local legislators protected for "conduct in the furtherance of the legislators' duties," including "voting, debate and reacting to public opinion"); *Church of the Lukumi Babalu Ave., Inc. v. City of Hialeah*, 688 F. Supp. 1522, 1526 (S.D. Fla. 1988) ("[h]olding a city council meeting is an essential function of the legislative process" for which officials are entitled absolute immunity); *Jones v. Ward*, 2011 WL 1187807, at *12 (M.D. Ala. Mar. 30, 2011) (any statements made on the floor of legislature during public meeting are foundation of legislative immunity and protected legislative acts).

***Third***, the purported "campaign" against Plaintiff, which consists of the police visit and public debate and discussion at subsequent Commission meetings, falls far short of the type of ongoing campaign of harassment found to amount to a chilling of speech.[12]  The Eleventh Circuit's watershed case on the issue, *Bennett v. Hendrix*, is instructive here.  In *Bennett*, plaintiffs alleged a longstanding campaign of harassment, including that police surveilled their homes and businesses, set up roadblocks near their homes, stopped them and issued false traffic citations, accessed confidential information about them, and mailed thousands of flyers calling them criminals.  423 F.3d at 1255–56.  Here, the brief interaction evaluating potential safety risks and subsequent open forum discussion of the interaction and debate about hotly contested political issues is not anything like the ongoing harassment or intimidation found in that and other cases.

## II.   COUNT III FAILS BECAUSE THERE WAS NO RESTRAINT ON SPEECH

Plaintiff claims that the City, Meiner, and Jones imposed an unlawful prior restraint on her

---

[12] The Complaint cites a handful of other alleged legislative and/or political actions by City officials, but none of that alleged conduct involved or was directed at Plaintiff.

speech when two officers spoke with her about a social media post and purportedly "instructed" her to refrain from posting similar content. Compl. ¶ 143. "A prior restraint on speech prohibits or censors speech before it can take place." *Cooper v. Dillon*, 403 F.3d 1208, 1215 (11th Cir. 2005), *abrogated on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009). The term "is used to describe administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993). "Classic prior restraints have involved judge-issued injunctions against the publication of certain information" or "where the government has unbridled discretion to limit access to a particular public forum," like a licensing scheme. *Cooper*, 403 F.3d at 1215. Courts distinguish "between 'a threat of criminal or civil sanctions after publication' which 'chills speech' and a prior restraint which 'freezes' speech." *Id.* at 1216; *Alexander*, 509 U.S. at 555–56 (no prior restraint even where forfeiture provision may induce cautious plaintiff to practice self-censorship).

Plaintiff alleges she was "instructed" to refrain from posting. But a vague and incomplete statement that "I would think to refrain from posting things like that," particularly without any threat of action against her if she continued to do so, does not amount to an advanced order prohibiting speech before it can take place. While courts have extended the doctrine to include forms of government pressure and intimidation that does not constitute a formal order or restraint, the allegations here simply cannot rise to the level of informal censorship found in those cases. For example, the Complaint cites *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), which held that a morality commission that investigated and recommended the prosecution of book publishers for violation of obscenity law operated as "a scheme of state censorship effectuated by extralegal sanctions" and amounted to a coercive prior restraint. *Id.* at 72. Particularly concerning was the fact that it effectively rendered the state's criminal regulation of obscenity unnecessary, and, in the process of doing so, enforced obscenity laws without the procedural safeguards of the criminal process. *Id.* at 68. A single statement, unaccompanied by threat of any consequence, is a far cry from the state-run system at issue in *Bantam Books*. Count III therefore fails as a matter of law.

## III.   COUNTS I, II, AND III FAIL AS TO THE CITY

Even if Plaintiff could show that these allegations amount to a constitutional violation, she cannot as a matter of law establish a claim as to the City. It is well settled that a municipality may not be held vicariously liable for the alleged acts of its employees based on *respondeat superior* under section 1983. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 692 (1978).

-15-

Rather, to state a claim against the City, Plaintiff must allege she has suffered a deprivation of her rights pursuant to an official policy or custom of the City. *Id.* at 694. "A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality. … A custom is a practice that is so settled and permanent that it takes on the force of law." *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997). She must show her constitutional rights were violated; the City "had a custom or policy that constituted deliberate indifference to that constitutional right"; and the "policy or custom caused the violation." *Smothers v. Childers*, 159 F.4th 922, 931 (11th Cir. 2025).

A practice or custom must be "so pervasive, as to be the functional equivalent of a policy adopted by the final policymaker." *Church v. City of Huntsville*, 30 F.3d 1332, 1343 (11th Cir. 1994); *Smothers*, 159 F.4th at 931 (custom must be "persistent and widespread"). "Normally random acts or isolated incidents are insufficient to establish a custom or policy." *Church*, 30 F.3d at 1343. Here, Plaintiff cannot establish that the City had a practice or custom so settled that it is the functional equivalence of City policy. She cites a handful of political and legislative activities that are unrelated to her and the alleged events underlying her claims: two City ordinances, including one that prohibits intentional blocking of public rights-of-way and another prohibiting the City from contracting with parties engaged in boycotts against Israel, as well as Meiner's public opposition to a documentary film that he considered to be antisemitic, which included a withdrawn resolution and a resolution encouraging the theater to showcase films highlighting a fair and balanced viewpoint. Compl. ¶¶ 29-37. Plaintiff also cites two Commission meetings, claiming the Mayor interrupted or challenged speakers to express his disagreement. *Id.* ¶¶ 38-46.

These alleged activities do not establish the functional equivalent of a policy of the City because Plaintiff has not shown that they constitute a widespread and persistent pattern of unconstitutional misconduct. First, Plaintiff has not established that any of the activities alleged are unlawful or unconstitutional. None of the legislation or sponsored resolutions have been found to be unlawful or constitutional, nor has conduct at the Commission meetings. While the sidewalk ordinance has been challenged, that case is pending and the claims were previously dismissed without prejudice and a preliminary injunction was denied upon a finding that the plaintiff was unlikely to succeed on the merits. None of the other actions have been challenged in court. Additionally, as explained above, the complained-of activity is protected under the First Amendment as well as legislative immunity. *See Riddle v. Omaha Pub. Schs.*, 2024 WL 1953758,

-16-

at *5 (D. Neb. Apr. 19, 2024), *aff'd,* 2024 WL 3694113 (8th Cir. Aug. 28, 2024) (dismissing retaliation claim against school district where plaintiff failed to show that incidents alleged were unconstitutional); *Khoury v. Miami-Dade Cnty. Sch. Bd.*, 4 F.4th 1118, 1133 (11th Cir. 2021) (no pervasive custom or practice where there was no evidence that incidents were unwarranted).

Second, these allegations are not sufficiently similar to Plaintiff's alleged injuries to constitute a widespread practice. Plaintiff claims that the City has adopted a policy of targeting criticism of the State of Israel. Compl. ¶ 25. But the general purported motivation behind certain legislation or opinions expressed by public officials is not an actionable custom. Plaintiff alleges retaliation based on a brief police visit about social media posts followed by characterizing her speech as antisemitic at public meetings. The handful of legislative and political activities cited is not sufficiently similar in nature to these allegations to constitute a widespread, pervasive practice. *See Riddle*, 2024 WL 1953758, at *5 (dismissing retaliation claims where incidents, including cutting off microphone during meeting, reaching out to individuals who opposed school policy and their employers, search of home of student who attended meeting, and failure to answer community member requests for information about policies, were not widespread, consistent, or similar enough "in nature to each other or [plaintiff's] own alleged injuries to evidence a customary conduct" of officials, even if they all could "constitute arguably retaliatory or censorial behavior").

## IV. COUNT IV FAILS AS TO THE CITY

Count IV alleges Plaintiff was purportedly blocked from Commissioner Suarez's Facebook account titled "David Suarez Miami Beach City Commissioner Group 5" in violation of the First Amendment. Compl. ¶¶ 149, 160, 164. She cannot establish a claim against the City on this basis.

First, the Facebook account at issue is alleged to be an individual account of Commissioner Suarez, not an account controlled by the City. In *Attwood v. Clemons*, for example, the Eleventh Circuit addressed whether a state representative was entitled to sovereign immunity for allegedly blocking plaintiff from his social media accounts. 818 F. App'x 863 (11th Cir. 2020). The concurrence opined that the complaint did not state a claim against the representative in his official capacity because it did not seek relief from the *office* held by the representative. *Id.* at 873. To the contrary, the account at issue belonged to the representative, not "whatever person happens to currently hold that office," and the relief sought was in the form of an injunction requiring the representative to unblock plaintiff from his accounts and prohibiting him from blocking plaintiff or others in the future. *Id.* at 874. On remand, the district court agreed and held the plaintiff had

not asserted a viable official capacity claim, as the relief sought (to unblock him) would not attach to the office or bind a future legislator. *Attwood v. Clemons*, 526 F. Supp. 3d 1152, 1162–63 (N.D. Fla. 2021). Here too Plaintiff alleges that the account at issue is individual; there is no allegation that it is an account for any person holding the office of Commissioner or that the account could be managed by a successor. And the relief sought (unblocking Plaintiff) would not bind the City.

Second, there is no allegation that Plaintiff was purportedly blocked from Suarez's Facebook account pursuant to an official policy or custom of the City as required under *Monell*. *See supra* 15-16. For example, there is no allegation of a widespread or pervasive practice of blocking such individuals so as to become the functional equivalence of City policy. *Id.*; *compare to Biederman v. Ehrhart*, 2023 WL 2394557, at *10 (N.D. Ga. Mar. 7, 2023) (representative's removal of objectionable content from Facebook page was pervasive where 60 individuals had been blocked by representative and there was a Facebook group dedicated to such blocked users).

## V.     COUNT IV FAILS TO STATE A CLAIM AGAINST COMMISSIONER SUAREZ

Plaintiff likewise cannot state a claim in Count IV against Commissioner Suarez in his individual capacity for allegedly blocking Plaintiff from his personal Facebook page.[13]

Section 1983 provides a cause of action against "'[e]very person who, *under color of any statute, ordinance, regulation, custom, or usage, of any State*' deprives someone of a federal constitutional or statutory right." *Lindke v. Freed*, 601 U.S. 187, 194 (2024) (emphasis in original). While public officials routinely interact with the public and "may look like they are always on the clock," they are also private citizens with their own constitutional rights. *Id.* at 196. By excluding from liability acts of officers in the ambit of their personal pursuits, the state-action requirement "protects a robust sphere of individual liberty" for those who serve as public officials or employees. *Id.* Thus, it follows that not everything a public official does constitutes state action. *Ha Chau v. X Corp.*, 2026 WL 1303058, *6 (N.D. Cal. May 12, 2026).

Indeed, the First Amendment itself "protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Id.* (citing *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006)). This right includes the ability to speak about "information related to or learned through public employment" if the speech is not "itself ordinarily within the

---

[13] While Commissioner Suarez has to take the allegations pled in the Complaint as being true, the reality is that Plaintiff was not blocked. Regardless, this claim should still be dismissed with prejudice for the reasons set forth herein.

scope of [the] employee's duties." *Id.* (citing *Lane v. Franks*, 573 U.S. 228, 236, 240 (2014)). It also includes "editorial control over speech and speakers on [the public employee's] properties or platforms." *Id.* (citing *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 816 (2019)).

The U.S. Supreme Court in *Lindke* recently set forth the test to determine whether a public official's deletion of comments and blocking of a social media user on a public post related to his official duties constituted state action. The Court stated that "[a] public official's social-media activity constitutes state action under § 1983 only if the official (1) possessed actual authority to speak on the State's behalf, and (2) purported to exercise that authority when he spoke on social media." 601 U.S. at 198.  The Court then went on to state that while "[the] appearance and function of the social-media activity are relevant at the second step," they "cannot make up for a lack of state authority at the first." *Id.*  Importantly, failure to meet the first prong under *Lindke*'s state actor test (i.e. possession of actual authority) disposes of the claim against the public official. *Lindke*, 601 U.S. at 201; *Marsh-Leigh v. Moore*, 2025 WL 3718353, *4 (N.D. Ill. Dec. 23, 2025).

### A. Plaintiff Cannot Demonstrate That Commissioner Suarez Had Actual Authority To Speak On Social Media On Behalf Of The City

The first prong of the *Lindke* test mandates that "the conduct allegedly causing the deprivation of a federal right be *fairly attributable to the State.*" *Lindke*, 601 U.S. at 188. "Private action – no matter how 'official' it looks - lacks the necessary lineage" to the State's (or here, the City's) power. *Lindke*, 601 U.S. at 198.  Just because a public official's social-media page "looks and functions like an outlet for city updates and citizen concerns," a public official's conduct on that page "is not attributable to the State unless he was 'possessed of state authority' to post city updates and register citizen concerns." *Ha Chau*, 2026 WL 1303058, at *7; *Lindke*, 601 U.S. at 199. If the State did not entrust the public official with those specific responsibilities, the State cannot "fairly be blamed" for the way the public official discharges them. *Ha Chau*, 2026 WL 1303058, at *7 (citing *Lugar*, 457 U.S. at 936).

The inquiry is "not whether making official announcements *could* fit within the job description; it is whether making official announcements is *actually* part of the job that the State entrusted the official to do." *Lindke*, 601 U.S. at 201 (emphasis original).  And actual authority to speak on the State's behalf may come from a "statute, ordinance, regulation, custom, or usage." *Id.* at 200 (quoting 42 U.S.C. § 1983). "Statutes, ordinances, and regulations refer to written law through which a State can authorize an official to speak on its behalf.  *Id.*  "Custom" and "usage"

encompass "persistent practices of state officials" that are "so permanent and well settled" that they carry "the force of law." *Id.*

Here, the Complaint is devoid of any factual allegations demonstrating that Commissioner Suarez had actual authority to speak on behalf of the City through his personal Facebook page. At most, Plaintiff asserts in a conclusory fashion that he "possessed actual authority, delegated to him by the City, to post City updates and register citizen concerns on this Official Facebook account" and that the City "expressly authorized him to do so." Compl. ¶¶ 154-55. Yet Plaintiff has not alleged (and cannot allege) any facts showing that Commissioner Suarez's alleged actual authority is rooted in any type of statute, ordinance or regulation. Plaintiff likewise has not alleged any facts that Suarez's actions with respect to his Facebook posts are so permanent and well-settled that they take on the force of law. Several courts have dismissed cases where, like here, the plaintiff failed to adequately plead actual authority. *See Ha Chau*, 2026 WL 1303058, at *9 (a single conclusory allegation that official had "actual authority" to speak on behalf of public body failed to satisfy *Lindke*'s first prong); *Devore v. McCombie*, 2026 WL 1283880, at *4 (N.D. Ill. May 11, 2026); *Moore*, 2025 WL 3718353, *4. This clear failure alone mandates dismissal.

## B. Plaintiff Cannot Demonstrate That Commissioner Suarez Exercised Any Authority To Speak On Social Media On Behalf Of The City

To determine whether a public official purported to exercise state authority when posting on social media, courts must consider the post's content and function under the circumstances in which it was made. *Ha Chau*, 2026 WL 1303058, at *10. Importantly, an official "does not necessarily purport to exercise his authority simply by posting about a matter within it." *Lindke*, 601 U.S. at 203. A public official "might post job-related information for any number of personal reasons, from a desire to raise public awareness to promoting his prospects for reelection." *Id.* And "many public officials possess a broad portfolio of governmental authority that includes routine interaction with the public, and it may not be easy to discern a boundary between their public and private lives. Yet these officials too have the right to speak about public affairs in their personal capacities." *Id.* If the public official "merely repeats or shares otherwise available information ... it is far less likely that he is purporting to exercise the power of his office" and it is "much more likely that he is engaging in private speech 'relate[d] to his public employment' or 'concern[ing] information learned during that employment.'" *Id.*; *Ha Chau*, 2026 WL 1303058, at *10.

Here, it is clear that Commissioner Suarez is not exercising any authority to speak on behalf of the City.  First, his personal Facebook page referenced in the Second Amended Complaint (https://www.facebook.com/davidsuarezmb) clearly shows that he is speaking on behalf of himself and not the City.  In it, there are no links to the City's Facebook page, the City's webpage, the City's phone number or even Commissioner Suarez's City-issued phone number.  Next, the only specific post cited by Plaintiff from Commissioner Suarez's Facebook page is in regards to promoting a public Town Hall meeting.  Compl. ¶ 152.  However, there are no allegations that such information was official information shared "exclusively" through Commissioner Suarez's post.  Rather such information was merely repeating, sharing and/or promoting public information.  Courts likewise have dismissed claims under *Lindke*'s second prong based upon similar allegations.  *Ha Chau*, 2026 WL 1303058, at *11; *Dixon v. Clayburn*, 2024 WL 5379014 (D.S.C. Oct. 10, 2024), *report and recommendation adopted*, 2025 WL 354416 (D.S.C. Jan. 31, 2025).

Thus, there is no state action by Commissioner Suarez and Count IV should be dismissed.

## VI.    CHIEF JONES IS ENTITLED TO QUALIFIED IMMUNITY

To the extent Counts I, II and II are asserted against Chief Jones in his individual capacity, they should be dismissed on the basis of qualified immunity.  "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  "Because qualified immunity is an entitlement not to stand trial or face the burdens of litigation, … questions of qualified immunity must be resolved at the earliest possible stage in litigation."  *Gonzalez v. Reno*, 325 F.3d 1228, 1233 (11th Cir. 2003).  "To receive qualified immunity, the government official must first prove that he was acting within his discretionary authority."  *Id.* at 1234.  "Once the defendants have established that they were acting within their discretionary authority, the burden shifts to the plaintiffs to show that qualified immunity is not appropriate."  *Id.*

"On a motion to dismiss, to evaluate claims of qualified immunity, the Court considers whether (1) the plaintiff has alleged a violation of a constitutional right; and (2) whether the right was 'clearly established' at the time of the defendant's misconduct."  *Shiver v. City of Homestead, Florida*, 2021 WL 5174526, at *8 (S.D. Fla. Oct. 4, 2021).  "These two steps do not have to be analyzed sequentially; if the law was not clearly established, the Court need not decide if Defendants actually violated the Plaintiff's rights."  *Id.*  "A right may be clearly established for

qualified immunity purposes in one of three ways: (1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Gilmore v. Georgia Dep't of Corr.*, 144 F.4th 1246, 1258 (11th Cir. 2025).

There can be no dispute that Chief Jones was acting within his discretionary authority with regard to the allegations against him – allegedly directing officers to speak with Ms. Pacheco about her post. *See Shiver*, 2021 WL 5174526, at *7 (official acts within discretionary authority when the challenged actions occurred in the performance of duties and within the scope of authority). Accordingly, the burden shifts to Plaintiff to show that qualified immunity is not appropriate. She cannot do so here because Chief Jones' alleged conduct did not violate a clearly established right.

As set forth above, courts have repeatedly found that, absent some actual or implied threat of adverse consequences, it is unlikely that a person of ordinary firmness would be deterred from exercising their rights where officers are merely investigating or speaking with an individual. No cases with similar facts establish that the officers' brief inquiry about a social media post that could pose a risk to public safety violated clearly established law. Indeed, as shown above, the alleged conduct at issue falls far short of the cases cited in the Complaint that found a chilling of speech as the result of overt threats or intimidation. And for these same reasons, the conduct alleged cannot be so egregious so as to violate a constitutional right even in the absence of case law.

Furthermore, the allegations here do not even rise to the type of conduct (*i.e.*, retaliatory investigation) that courts have expressly held is not a violation of clearly established law. In *Rehberg v. Paulk*, the plaintiff sent critical, anonymous faxes to hospital management and, as a favor, the district attorney's office allegedly initiated a criminal investigation without probable cause and obtained his phone records and emails. 611 F.3d 828, 835 (11th Cir. 2010). The Eleventh Circuit concluded that the "Supreme Court has never defined retaliatory investigation, standing alone, as a constitutional tort,…and neither has this Court. Without this sort of precedent, [plaintiff] cannot show that the retaliatory investigation alleged here violated his First Amendment rights." *Id.* at 851. Moreover, "a retaliatory animus does not create a distinct constitutional tort." *Id.* at 850. The defendants were therefore, at a minimum, entitled to qualified immunity because the right to be free from retaliatory investigation was not clearly established. *Id.* at 850–51.

More recently, in *Shiver*, the court applied *Rehberg* to conclude that officers who allegedly

-22-

conducted a retaliatory investigation without a legitimate law enforcement purpose were entitled to qualified immunity. 2021 WL 5174526, at *8–10.  The court observed that the allegations were unlike cases in which an adverse effect chilling speech has been found based on a campaign of retaliation or based on intimidation that potentially endangered the plaintiff's life.  *Id.* at *10. Instead, the court emphasized that the Eleventh Circuit has held that the type of conduct at issue was not a violation of clearly established law because a plaintiff's "right to be free from a retaliatory investigation is not clearly established."  *Id.*; *see also Thompson v. Hall*, 426 F. App'x 855, 859–60 (11th Cir. 2011) (sheriff and deputy entitled to qualified immunity because initiation of criminal investigation does not itself implicate a constitutional right).

In this case, Plaintiff alleges only that two police officers made a brief inquiry at her doorstep.  Even if that could be considered a retaliatory investigation, Plaintiff cannot establish that the allegations against Chief Jones violated a clearly established right.

## VII.  MAYOR MEINER IS ENTITLED TO QUALIFIED IMMUNITY

Counts I, II, and III should likewise be dismissed on the basis of qualified immunity as to Mayor Meiner. Mayor Meiner was indisputably acting within his discretionary authority at all relevant times. The conduct attributed to him – engaging with constituents on social media, forwarding a constituent's social media post that could provoke others to commit violence to the Chief of Police, and publicly commenting on matters of public concern at City Commission meetings and in the media – falls squarely within the duties and scope of authority of a municipal mayor. *Shiver*, 2021 WL 5174526, at *7. The burden therefore shifts to Plaintiff to defeat qualified immunity, and she cannot do so.  *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003).

*First*, Plaintiff has not alleged a violation of any First Amendment right by Mayor Meiner. The conduct attributed to him consists of forwarding Plaintiff's Facebook post to the Chief of Police and publicly defending the ensuing police inquiry. For the reasons set forth *supra*, the inquiry – a brief, non-coercive doorstep conversation, without any threat of arrest or adverse consequence – does not constitute an adverse action sufficient to chill a person of ordinary firmness, does not amount to viewpoint discrimination or retaliation actionable under the First Amendment, and does not amount to a prior restraint.

But even if Plaintiff is correct that this routine interaction is somehow a First Amendment violation, her claim fails for the separate and independent reason that – based on the exhibits that she elected to incorporate into her Complaint – Mayor Meiner never ordered the police to her

home. Indeed, the Commission record Plaintiff incorporates reflects that the decision to send officers to Plaintiff's home was Chief Jones' own, and that Mayor Meiner neither requested it nor knew of it. Compl. ¶ 101 (https://miamibeachfl.new.swagit.com/videos/374224 at 1:04:08-1:06:41) (last visited June 19, 2026); *see also Crenshaw v. Lister*, 556 F.3d 1283, 1292 (11th Cir. 2009) ("It is the law in this Circuit that when the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern."). Chief Jones' and Mayor Meiner's respective statements to the media confirm this as well. *Id.* ¶¶ 104-05.[14] Plaintiff attempts to skirt around these irrefutable facts by suggesting that there is some ambiguity about whether Mayor Meiner ordered Chief Jones to send police to Plaintiff's home. *Id.* ¶ 66 ("Defendant Jones **and/or** Meiner directed two Miami Beach police officers to go to Plaintiff's home[.]"). The Court should reject these "hide-the-ball" tactics and hold Plaintiff to the veracity of the exhibits that she elected to incorporate into her Complaint. *See Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1205-07 (11th Cir. 2007). Simply put, she has conceded that it was Chief Jones who ordered the police to her home, and her equivocation should not save her claims from dismissal here. Moreover, Plaintiff's own allegations plainly refute her assertion that she was somehow deterred from speaking: as the Complaint makes clear that Plaintiff (i) posted the video of her interaction with the police online to the public, *id.* ¶ 83; and (ii) attended two separate Commission meetings after the police visited Plaintiff's home, *id.* ¶¶ 90, 112, and actively participated in at least one of the meetings, *id.* ¶ 112. Plaintiff therefore cannot establish the threshold element of any constitutional violation.

*Second*, even if Plaintiff could establish a constitutional violation, no clearly established law placed Mayor Meiner on notice that his alleged conduct was unlawful. No case would have put a reasonable mayor on notice that forwarding a constituent's inflammatory social media post to the Chief of Police in which she falsely accused the mayor of being an accomplice to an alleged mass murder, or the mayor later defending the resulting police inquiry, violates the First Amendment. In fact, as explained *supra*, the Eleventh Circuit has squarely held that "the right to be free from a retaliatory investigation is *not* clearly established," *Shiver*, 2021 WL 5174526, at

---

[14] And to the extent that Plaintiff alleges "[u]pon information and belief" that the officers "belong to [Mayor] Meiner's personal protection detail[,]" Compl. ¶ 81, by acting under Chief Jones' independent instructions and not Mayor Meiner's, any 1983 claim cannot proceed against Mayor Meiner under a theory of respondeat superior. *Busby v. City of Orlando*, 931 F.2d 764, 782 (11th Cir. 1991) ("[A] supervisor cannot be held liable on the basis of respondeat superior for the acts of his inferiors under section 1983.").

*10 (emphasis in original), and that "retaliatory animus does not create a distinct constitutional tort," *Rehberg*, 611 F.3d at 850; *see also Thompson*, 426 F. App'x at 859 (defendants "are entitled to qualified immunity insofar as Plaintiffs have alleged they carried out an investigation in 2005 in retaliation for Plaintiff['s] comments at the town hall meeting").

*Finally*, to the extent that the Complaint alleges that Mayor Meiner's conduct in administering City Commission meeting(s) infringed on her constitutional rights, any such alleged conduct, such as determining the amount of time for public comment, is protected by legislative immunity (separate and in addition to qualified immunity). *See, e.g.*, *Gays Against Groomers v. Garcia*, 169 F.4th 981, 998 (10th Cir. 2026) ("The legislature's time is its own. The Legislators' interruption of and early termination of Goeke and Guggenheim's time to speak no more exceeded the legislative function than a judge exceeds the judicial function by interrupting or cutting off counsel during oral argument."); *Jones*, 2011 WL 1187807, at *12 ("In this case, any statements made during the public Commissioners' meeting … are protected legislative acts. Statements made on the floor of the legislature are the foundation of legislative immunity.").

In sum, because Mayor Meiner acted within his discretionary authority, Plaintiff has not alleged a violation of any First Amendment right, and no clearly established law placed him on notice that any alleged conduct violated the First Amendment, he is entitled to qualified immunity. The claims against Mayor Meiner should therefore be dismissed with prejudice.

## VIII.   COMMISSIONER SUAREZ IS ENTITLED TO QUALIFIED IMMUNITY

Commissioner Suarez is likewise entitled to qualified immunity.  While Plaintiff has ostensibly asserted claims against Commissioner Suarez in Counts I, II and IV, the only specific unconstitutional acts being asserted against him are in Count IV.[15]  Commissioner Suarez is entitled to qualified immunity as to Count IV as there is no clearly established law that a public official who does not have actual authority to speak on behalf of a city on his personal social media page cannot block people on that page.  In fact, the opposite is true.  *See* Section V, *supra*.

## CONCLUSION

For the reasons stated, Defendants City of Miami Beach, Steven Meiner, David Suarez, and Wayne A. Jones respectfully request that the Second Amended Complaint be dismissed.

---

[15]  To the extent Plaintiff asserts otherwise, Commissioner Suarez adopts the arguments by Mayor Meiner in Section VII as to why he is entitled to qualified immunity on Counts I and II.

Dated:  July 6, 2026

/s/  *Etan Mark*

Etan Mark (FBN 720852)
Charles M. Garabedian (FBN 1000974)
MARK FERRER & HAYDEN
Brickell City Tower, Suite 1999
80 Southwest 8th Street
Miami, Florida 33130
Telephone:  (305) 374-0440
etan@mfh.law
charles@mfh.law

*Attorneys for Defendant*
*Steven Meiner*

/s/  *Matthew H. Mandel*

Joseph H. Serota (FBN 259111)
Matthew H. Mandel (FBN 147303)
WEISS SEROTA HELFMAN COLE
  & BIERMAN
2800 Ponce de Leon Blvd., Suite 1200
Coral Gables, Florida 33134
Telephone:  (305) 854-0800
jserota@wsh-law.com
mmandel@wsh-law.com

*Attorneys for Defendant*
*David Suarez*

Respectfully submitted,

/s/  *Enrique D. Arana*

Enrique D. Arana (FBN 189316)
Scott E. Byers (FBN 68372)
Rachel A. Oostendorp (FBN 105450)
CARLTON FIELDS, P.A.
2 MiamiCentral, Suite 1200
700 NW 1st Avenue
Miami, Florida 33136
Telephone:  (305) 530-0050
earana@carltonfields.com
sbyers@carltonfields.com
roostendorp@carltonfields.com

*Attorneys for Defendants*
*City of Miami Beach and Wayne A. Jones*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 6th day of July 2026, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system, which in turn automatically generated a

Notice of Electronic Filing (NEF) to all parties in the case who are registered users of the CM/ECF

system.  The NEF for the foregoing specifically identifies the recipients of electronic notice.

/s/  *Enrique D. Arana*

145086039